The petition was presented to me by Frank Hague, a resident of the city of Jersey City, and a citizen of the State of New Jersey, alleging that he had been arrested and that he *Page 35 
was unjustly and unlawfully detained by D. Frank Garrison, sergeant-at-arms of the senate of the State of New Jersey, by virtue of an alleged warrant purporting to have been issued under the authority of a concurrent resolution of the senate and general assembly of the State of New Jersey. A copy of said resolution, and of the alleged warrant, is annexed to and made part of said petition. The reasons relied upon by the petitioner to manifest that he was unlawfully arrested, and unjustly and unlawfully detained in the custody of said D. Frank Garrison, are numerous, and set out in detail in the aforesaid petition, which concludes by the petitioner praying to be relieved of the unlawful detention complained of, and that a writ of habeascorpus be directed to the said D. Frank Garrison so that the petitioner may be forthwith brought before this court, to do, submit to and receive what the court may direct. Upon reading and filing petition, I made and filed an order that a writ of habeascorpus forthwith issue out of and under the seal of this court, according to the prayer of said petition. Such a writ was thereupon issued under the seal of the court of chancery directed to said D. Frank Garrison, commanding him to have the body of said Frank Hague before "our chancellor [or such vice-chancellor as may sit for him], * * * on the 22d day of November, 1928, * * * to do, submit to, and receive, what shall then and there be considered in that behalf." Pursuant to the command of said writ said D. Frank Garrison produced the petitioner before me, exhibited the warrant in question, stated that he was then and there unprepared to make a formal return in writing to said writ, and requested leave to make a formal return thereto on the following day, which request was granted.
 AS TO BAIL.
Counsel for the petitioner thereupon made application to me for the release of the petitioner on bail pending a hearing under said writ, which application was opposed by the solicitor for the respondent, who urged that the petitioner was not entitled to be released on bail, and he cited, in support of his *Page 36 
objection, In re Thompson, 85 N.J. Eq. 221. In overruling said objection I stated that the cited case was not analogous to the case at bar, particularly in that the cited case was one in which Thompson was held under an extradition warrant issued by the governor of New York, duly honored by the acting governor of New Jersey. I ordered that pending the determination of the proceedings under said writ of habeas corpus, the petitioner be permitted to enter into bond to the chancellor of the State of New Jersey, with sufficient surety, in the sum of $1,000, to be approved by a special master of this court, or by the court, the said bond to provide that the petitioner shall appear before this court when and as directed, from day to day, and from time to time, and not to depart without leave, and to answer to, and abide by, the order and direction of this court upon the proceedings pending upon said writ. In compliance with said order a bond, approved by a special master, was duly filed. On the day following, a formal return, in writing, was made by respondent, to said writ, which return was duly filed. Counsel for the petitioner announced at the commencement of the hearing that the application for the writ in the instant case was based on the common law — not under the statute. It is indicated In reThompson, supra (at p. 234), that our supreme court has decided that habeas corpus is a common law, and not a statutory writ. The cited case, opinion by our present chancellor, demonstrates that the writ of habeas corpus ad subjiciendum is a common law writ confirmed and regulated by statute, which did not create, but came in aid of, the jurisdiction; that the writ issued out of the court of chancery, king's bench, common pleas and exchequer in England; that in this state the power of the chancellor to grant a writ of habeas corpus was, by the common law and the Habeas Corpus act of March 11th, 1795, the power to issue the writ out of the court of chancery; that the HabeasCorpus act of March 27th, 1874, contains no reference to the chancellor or the court of chancery, but was impotent, in the slightest degree, to curtail or abridge the chancellor's power with reference to that ancient and efficacious writ, for that jurisdiction, existing at common law, was inherited by our court of chancery from *Page 37 
its prototype the high court of chancery in England, was recognized and confirmed by the Habeas Corpus act of March11th, 1795, and was vested in, and guaranteed to, our court of chancery by the constitution of 1844. The authority of avice-chancellor to issue a writ of habeas corpus, while not questioned in the case at bar, is clearly demonstrated by Chancellor Walker in the Thompson Case, supra (at pp. 248,262). And said case (at pp. 268, 269) clearly indicates the authority of this court to release the petitioner on bail pending the hearing under the writ of habeas corpus. The case ofBarth v. Clise, 12 Wall. (U.S.) 400; 20 L.Ed. 393 (which was not an extradition case), is cited, wherein it was held: "By the common law, upon the return of a writ of habeas corpus and the production of the body of the party suing it out, the authority, under which the original commitment took place, is superseded. After that time and until the case is finally disposed of, the safe-keeping of the prisoner is entirely under the control and direction of the court to which the return is made. The prisoner is detained, not under the original commitment, but under the authority of the writ of habeascorpus. Pending the hearing he may be bailed de die in diem, or be remanded to the jail whence he came, or be committed to any other suitable place of confinement under the control of the court. He may be brought before the court from time to time by its order until it is determined whether he shall be discharged or absolutely remanded." The mere fact that the process upon which the respondent relies as authority for the arrest and detention of the petitioner issued, as he claims, from the senate and general assembly of the State of New Jersey, does not minimize the authority of this court to inquire on habeascorpus into the lawfulness of such arrest and detention. When the court issues the writ of habeas corpus to inquire into the cause of an arrest and detention of a citizen of this state, it has the right further to inquire into subject-matters, and determine whether the committing body had jurisdiction or not, otherwise the issuing the writ would be an idle ceremony, and really to no purpose. When the jurisdiction of a tribunal by whose mandate a citizen is deprived of his liberty *Page 38 
is challenged, the person challenging same may do so by habeascorpus. Ex parte Lam Pui, 217 Fed. Rep. 456, 461; People v.Frost, 120 N.Y. Supp. 491; Ex parte Steiner, 202 Fed. Rep. 419.
In In re Gunn, 50 Kan. 155; 19 L.R.A. 519, it was held that the court was empowered to inquire on habeas corpus into the lawfulness of imprisonment by an order or resolution of the house of representatives of that state; that said house was not the final judge of its own powers and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by the court; that it was especially competent and proper for the court to consider whether the proceedings of said house were in conformity with the constitution and laws, because, living under a written constitution, no branch or department of the government is supreme, and it is the province and duty of the judicial department to determine, in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity with the constitution, and, if they have not been, to treat their acts as null and void. It was also held to be the acknowledged power of the court to declare acts of the legislature void. The court referred to State v. Francis,26 Kan. 724, in which it appeared there was nothing upon the face of the act to show but what it was a legal enactment. It was properly signed. It was properly enrolled. It was properly published. But the court went into the house of representatives and examined its journals, ascertained therefrom that the house was not a constitutional body, and thereupon declared the act void. Lack of precedents, if such there be, for the release on bail of a person taken in custody on a warrant issued under the alleged authority of a body such as assumed the right to issue the warrant in the case at bar may be attributable to the unprecedented claim of the alleged right of said body to effect the arrest of the petitioner whom it contemplates should be kept in custody by the arresting officer for the period of time between the date of the issue of the warrant and the date designated therein for the production of the petitioner before the body which authorized *Page 39 
the issue of said warrant (six days), instead of requiring him to be arraigned forthwith. If the body which caused the issue of the warrant in question was authorized to require the arrest of the petitioner and his detention in custody for a period of six days, as indicated by the warrant, it may likewise claim authority to cause his arrest and detention to await the pleasure of the reassembling of such body before whom he was required to be arraigned by the arresting officer. Such claim is unprecedented, and, in my judgment, untenable. That no precedent may be found for liberating the petitioner on bail pending a hearing under a writ of habeas corpus in a case such as at bar, if such were the fact, would not prevent a court of equity from acting in the premises. Allen v. Distilling Co., 87 N.J. Eq. 531 (at p.544); and see Earle v. American Sugar Refining Co., 74 N.J. Eq. 751,
wherein the present chancellor, then vice-chancellor, declared the principles of equity will be applied to new cases as they are presented, and relief will not be withheld merely on the ground that no procedent can be found. See, also, Palmer v.Palmer, 84 N.J. Eq. 550. That the court of chancery of New Jersey has power of relieving against all wrongs for which the law gives no adequate remedy, was recently declared (November 19th, 1928) by the United States supreme court in Lehigh ValleyRailroad Co. v. Board of Public Utility Commissioners,278 U.S. 24, in which there is quoted an excerpt from Allen v.Distilling Co., supra, wherein this court said: "So long as courts of equity are to serve the purpose of the creation of the court of chancery of England, and in this state the court of chancery is the successor, in all that such term implies, of that court, jurisdiction must depend only upon the existence of, or a threatened, wrong, and the absence of an adequate remedy at law. * * * Due to our habit of endeavoring to find decided cases to fit each situation, we too often overlook the fundamental reasons for the creation or evolution of the court. It received no grant of express powers nor were express duties imposed upon it. The law courts were left to deal with the violation of all rights for which they could give an adequate remedy. The duty of relieving against any remaining wrongs was imposed upon the court of *Page 40 
chancery." It is well established that our legislature may not impair the jurisdiction of the chancery court, nor the powers of such court, as they existed when the state constitution was adopted, and there is much latitude in their jurisdiction growing out of this. Traphagen v. West Hoboken, 39 N.J. Law 232;Flanigan v. Guggenheim Smelting Co., 63 N.J. Law 647.
 AS TO PROCEEDINGS ON RETURN OF WRIT.
Counsel were not in accord at the commencement of the hearing as to the requisite procedure under habeas corpus. As hereinabove stated, the petition for the writ of habeas corpus
contains numerous reasons, set out in detail, upon which the petitioner bases his claim that the warrant in question is insufficient, in law, to authorize his arrest and detention in custody. The return to the writ merely sets out as the authority of the arresting officer, the warrant in question. Such a return by the officer is sufficient. The petitioner, upon leave of the court, filed a traverse to said return, restating the reasons set out in the petition, and amplifying same. The petitioner is not restricted in his presentation to the court, to the reasons set up in his petition and traverse, to sustain his claim that his arrest and detention is illegal, and in violation of the constitutional guarantee of liberty of the citizen and due process of law founded on the state and federal constitutions. The respondent did not demur to the traverse, or move to strike same — which is the course of action permissible under our present general practice in lieu of the old practice of demurrer.In re Thompson, supra (at pp. 248, 256), holds that when a person petitions for a writ of habeas corpus out of this court he thereby commences a suit and prosecutes a cause in this court. Having in mind our present chancery practice that every material allegation of fact in a pleading which is not denied by the adverse party, is deemed to be admitted (except as against an infant, or person of unsound mind) unless such adverse party avers that he has no knowledge or information thereof sufficient to form a belief, the petitioner's material allegations of fact set out *Page 41 
in his petition, and traverse to the respondent's return to the writ, which are not denied by the respondent, would, if the general practice of the court were to be regarded as applicable, require the court to sustain such allegations and determine the case at bar in favor of the petitioner on the pleadings. It appears to me, however, that such practice should not be regarded as applicable to habeas corpus proceedings, and therefore, notwithstanding the lack of denial by the respondent of the petitioner's allegations, such should not be taken as true without proof thereof. The return is not to be treated as an answer to the petition, but rather as a response to the writ. The allegations in the petition are made for the purpose of obtaining the allowance of the writ, and I do not consider it necessary that they be denied by the respondent in his return to the writ. When the petitioner desires to controvert the return to the writ, or allege any new matter showing the restraint to be illegal, he may do so after the return is made. In this way an issue may be formed, and upon a hearing the disputed questions of fact settled. The pleadings as now before me afford a wide scope of inquiry as to the sufficiency, in law, of the warrant in question, and such inquiry involves the jurisdiction of the body which issued the warrant, to issue it, and because thereof considerable testimony and proofs were admitted in the case at bar, some of which subject to the objection of counsel for the respondent as to the relevancy thereof. The procedure hereinabove stated is supported, in my judgment, by Richards v. Collins,45 N.J. Eq. 283; 29 Corp. Jur. 163, 164; In re Chipchase
(Kan.), 43 Pac. Rep. 264.
 AS TO THE WARRANT.
My research of the law and consideration of the briefs submitted actuates me in determining that no legislative body may lawfully issue a warrant requiring the arrest of a person charged with contempt of such body and the detention of such person thereunder for arraignment before such body at a period of time six days subsequent to the issue of the warrant, as in the case at bar, thereby depriving the arrested person of his liberty for such period of time. I have not *Page 42 
found any precedent therefor. If such practice were to be countenanced in the instant case, the legislative body may, in another instance, assume authority to cause the arrest and detention of a person under its warrant, and the arraignment of such person at such time thereafter — thirty days, sixty days, ninety days, or more — as such body may, in its discretion, reassemble. Such a practice would be reprehensible and Un-American. Suppose the arrested person, upon arraignment, were exonerated of the charge of contempt — what redress would he have for his six days' illegal restraint and deprivation of liberty? The question evokes condemnation of such practice and violation of personal liberty, and is clearly without due process of law.A fortiori the body which assumed authority to issue the warrant in question, to wit, a joint session (?) of the senate and general assembly of the State of New Jersey, is without authority to do that which a legislative body, meaning either the senate or general assembly, may not do. It has never heretofore been attempted to hale a person before "the bar of the joint session of the senate and general assembly" of this state, to answer for an alleged contempt occasioned by failure or refusal to obey a subpoena issued by a joint committee of the senate and general assembly. I have been unable to find in my research of the law that any two houses, constituting a legislature, have ever heretofore adopted a like proceeding. Every reported case has considered the privilege or the right, as the case may be, alleged to have been violated, as a privilege or right inhering in each of the two houses as separate bodies, whenever there have been two houses constituting the legislature. In New Jersey "the legislative power shall be vested in a senate and general assembly." State Const. art 4 § 1 ¶ 1. No warrant may be lawfully issued by the order of the general assembly except in accordance with the requisites of house rule 9 which provides: "All acts, addresses and joint resolutions shall be signed by the speaker; and all writs, warrants and subpoenas issued by the order of the house shall be under his hand and seal, and attested by the clerk. * * *" The essential requirements of a warrant issuing from the general assembly are three-fold: (1) That the house order its *Page 43 
issue; (2) when issued it shall be under the hand and seal of the speaker of the house; (3) when duly ordered by the house, and signed and sealed by the speaker, it be attested by the clerk of the house. None of such requisites may be ignored. A warrant ordered by the house which does not contain all of the essential requisites aforesaid, is nugatory. It is urged by the solicitor of the respondent that because the speaker of the house testified that he had no seal, the requirement for affixing his seal may be disregarded. The speaker testified that his only knowledge that a seal was not provided for the speaker of the house was that the clerk of the house, whom he expected to obtain from the state house custodian all of the paraphernalia pertaining to the office of speaker of the house did not furnish him therewith. Such a quest of the speaker of the house for the seal, which is part of the equipment of the speaker of the house, and which imports authority on writs, warrants and subpoenas issued under the authority of house rule 9, is not convincing that if he had made diligent effort he would have not only ascertained that the speaker of the house was provided with a seal, but may readily have obtained same for his use and affix it to the warrant signed by him. The affixing of the speaker's seal to the warrant was as much a requisite to the validity thereof as the signing of the warrant by the speaker, and the attest of the warrant by the clerk of the house. The speaker's seal, like his signature, and the attest of the clerk of the house, signify authority. The warrant in question is not the warrant which is authorized to be issued under the rules of the senate and general assembly. Counsel for the respondent, in arguing that the warrant in question need not bear the seal of the speaker of the house, contended that it was not the warrant of the house, but of both houses, and yet, he urges that "the bar of the joint session of the senate and general assembly" must be regarded as tantamount to the bar of the senate and the bar of the general assembly. Such argument is untenable. The fact is that the warrant in question purports to be the joint warrant of both houses. Counsel disdains the express requirement of house rule 9 thatall writs, warrants and *Page 44 
subpoenas issued by order of the house shall be under the handand seal of the speaker, and attested by the clerk. He says said rule does not apply. I fail to appreciate why not! It applies toany warrant issued by order of the house, and unmistakably embraces any warrant which the general assembly is a party to. The bar before which the petitioner is directed to be arraigned is "the bar of the joint session of the senate and general assembly," and the warrant for the petitioner's arrest and arraignment could not lawfully have been issued except by orderof the house — for arraignment before the bar of the house — within the purview of house rule 9. The concurrent resolution
upon which the warrant is predicated provides "that the senate and general assembly of the State of New Jersey meet in joint session * * * for the purpose of considering the alleged contempt of said Frank Hague and taking action thereon." In thepreamble of said resolution it is stated that the petitioner failed and refused to appear before the joint committee as commanded by subpoena, and the joint committee reported to the senate and general assembly that he thereby willfully contemned the authority of the senate and general assembly of the State of New Jersey, and resolves that the senate and general assembly meet in joint session on November 26th, 1928, "for the purpose of considering said alleged contempt of the said Frank Hague and take action thereon" * * * and the arresting officer is to "have him at the bar of the joint session of the senate and general assembly * * * to answer as for a contempt in refusing to obey the subpoena of the joint committee." The report of the joint committee in and by which the committee adjudged the petitioner guilty of contempt of the legislature was adopted by both houses — thereby concurring in the adjudication of the joint committee. In view thereof, what action could the joint session
contemplate taking upon the arraignment of the petitioner before said body? The avowed purpose mentioned in the concurrent resolution "for the purpose of considering said alleged contempt * * * and take action thereon * * * and to have petitioner before the bar of the joint session "to answer *Page 45 
as for a contempt * * *," was dispelled by the action of both houses in adopting the report of the joint committee adjudging
that the petitioner had willfully contemned the authority of the senate and general assembly of the State of New Jersey. The bar of the joint session of the senate and general assembly having, in my judgment, no legal existence for the purpose contemplated by the concurrent resolution, it follows, as a logical sequence, that the petitioner cannot be arraigned before such bar, and the warrant which ostensibly calls therefor is therefore nugatory. My research has failed to disclose any case holding that there can be contempt of the legislature by the refusal of a witness to appear before a joint committee, that is, where there has been an attempt by the legislature to punish as for a contempt of the legislature — the two houses acting in joint session therefor — excepting, of course, where both houses hold a joint meeting
expressly authorized by the constitution and for express purposes therein provided — in which case a person may be held in contempt of said body for disorderly conduct in its presence, interference with its proceedings, or the like. No authority was cited other than State v. Brewster, 89 N.J. Law 658; relied upon by counsel for the respondent, who urged that because the two houses may investigate through a joint committee, failure or refusal of a witness subpoenaed to attend before such committee may not only be made the subject-matter of a prosecution for misdemeanor in accordance with P.L. 1895 p. 162 § 2; 2 Comp. Stat. p.2241 § 68, but, that it necessarily follows that the senate and house of assembly in joint session may also punish the recalcitrant witness as and for a contempt of the legislature for failure or refusal to appear before such committee. This is nonsequitur. It may be taken for granted, I assume, that the senate and general assembly, acting separately, may respectively appoint a committee which when so appointed may investigate matters within the scope of legitimate inquiry for the purpose of acquiring information for proposed legislation. Such committees report to the senate and general assembly respectively. While themeans resorted to for investigation, that is, a joint *Page 46 
committee, may be regarded as within the authority of the legislative bodies, the right is separate and distinct in each house. When the two houses exercise their distinct right of investigating by means of a joint committee, the legislature — "the senate and general assembly of the State of New Jersey" — under statutory provisions enacted characterizing the failure of a witness to obey a subpoena issued by such joint committee to be a misdemeanor, may cause his prosecution therefor. It does not follow as a logical sequence, however, that if each house proceeds against a recalcitrant witness as for a contempt because of his failure to obey the subpoena of a joint committee that both houses may act in joint session to punish the alleged contemnor for the alleged contempt of such joint committee, or the legislature, which the joint committee represents. Such action, in my judgment, is untenable in law, and my research has failed to reveal any precedent to justify such a proposal.State v. Brewster, supra, is not an authority for the right of the legislature in joint session to punish for contempt, or for the purpose of hearing and determining a matter of contempt, or to create "the bar of the joint session of the senate andgeneral assembly of the State of New Jersey" for the hearing of such matter. Whatever means the two houses use for the purpose of investigating, the right to investigate is separate and distinct in each house, and when it is sought to punish a recalcitrant witness, the right so to do must be vindicated by the senate or
general assembly, in their separate relations, for the reason that the right so to do is separate, not joint. Neither the case of State v. Brewster, nor the fact that the legislature may because of statutory regulation providing for the election or appointment of certain officers hereinafter named meet in joint meeting for the election or appointment of such officers, be regarded as in anywise significant as to the power of the two houses to meet in joint session to act upon an alleged contempt for disregard of the powers and privileges of the legislature, as such, or of a joint committee. The fact, as I regard it to be, that no precedent may be cited to sustain the respondent's claim that the legislature in joint meeting *Page 47 
may punish a recalcitrant witness for contempt in cases other than where the legislative bodies have been lawfully convened in joint meeting, as hereinabove indicated, is significant as against any such right.
 AS TO JOINT SESSION.
The senate and general assembly were unauthorized to meet injoint session to authorize the issue of the warrant in question to hale the petitioner before such joint session for the purpose contemplated by such warrant. What may the legislature dojointly? Only that authorized by the state constitution, as hereinafter specifically mentioned. The senate and general assembly, acting separately, may appoint committees and authorize them to act jointly for particular purposes mentioned, but the committees thus appointed and acting cannot do more than report back to their respective appointing bodies. In Snow v. Hudson,56 Kan. 378; 43 Pac. Rep. 260, 262, the court, in defining joint session, said: "The term `joint session' in our view has a well-recognized meaning, and implies the meeting together and commingling of the two houses, which, when so met and commingled, act as one body. Each member of that body, when it has been once properly and lawfully convened, has equal rights, and his vote has equal weight with that of any other member." In Richardson
v. Young, 122 Tenn. 471; 125 S.W. Rep. 664, the court, in defining a joint session, says: "The term `joint session' * * * implies the meeting together, a mingling of the two houses, which when so held and mingled act as one body." The legislature of New Jersey is constitutionally authorized to hold a joint meeting
in special instances, to wit: For the purpose of electing a governor, when two or more persons shall be equal and highest in votes cast by the legal voters of the state. One of which persons shall be chosen governor by a vote of a majority of the members of both houses in joint meeting. Const. art. 5 ¶ 2. The state treasurer and comptroller shall be appointed by the senate and general assembly in joint meeting. Const. art. 7 § 2 ¶ 3. *Page 48 
I am aware that it has been the practice of the senate and general assembly to hold meetings for the appointment of commissioners of deeds, commissioner of motor vehicles, state director of railroads and canals, and superintendent of elections in Essex and Hudson counties, and that statutory authority is relied upon therefor. It is unnecessary, in the case at bar, to determine the legal propriety of such action. The implied constitutional inhibition against holding joint meetings of the two houses of the legislature for purposes other than therein expressly provided is momentous when we consider the system of checks and balances created by our constitution — manifested by the legislative, executive and judicial departments of our government. What may be effectuated by a majority vote when the two houses are lawfully assembled in joint meeting might not be effectuated when the two houses meet separately, and when, at said meeting "a majority of all the members of each body personally present and agreeing thereto" is required to effectuate the contemplated purpose. Const. art. 4 § 4 ¶ 6.
To illustrate: The senate, as authorized by the constitution (art. 4 § 2 ¶ 1), is composed of twenty-one members, and the general assembly, as authorized by the constitution (art. 4
§ 3 ¶ 1), is composed of sixty members. Under article 4, section 4, paragraph 6, of the constitution, "no bill or joint resolution shall pass unless there be a majority of all the members of each body personally present and agreeing thereto; * * *." Assuming that fourteen members of the senate and twenty-seven members of the general assembly are classified as Republicans, and seven members of the senate and thirty-three members of the general assembly are classified as Democrats — it can readily be perceived that on a strict partisan vote Republicans could by amajority vote at a joint meeting effectuate a contemplated purpose, whereas, both houses meeting separately, Republicans, not having a majority vote in each house, could not effectuate their contemplated purpose. The aforesaid illustration manifests the wisdom of the framers of our constitution in providing, as they did, "that the legislative powers shall be vested in a senate and general assembly" (art. 4 *Page 49 
§ 1 ¶ 1), and that "no bill or joint resolution shall pass unless there be a majority of all the members of each body personally present and agreeing thereto." Art. 4 § 4 ¶ 6.
The constitution should be strictly adhered to. Departure therefrom at the whim of partisans would tend to circumvent the interdicts and requirements of that glorious instrument upon which the public weal and the liberty and security of our citizens is founded. Counsel for the respondent urged in argument that the petitioner has no right to assume that when he is brought before the joint session, upon the warrant in question, that the senate and general assembly may not act separately, and therefore, the question of the right of the legislative bodies to meet in joint session is premature, and may not be considered and determined by the court in this habeas corpus proceeding. Such argument is incredible. The petitioner is not ordered to be arraigned before the senate or the general assembly. The concurrent resolution, and the warrant purporting to be issued under the authority thereof, directs the respondent to arraign the petitioner before "the bar of the joint session of the senate and general assembly," and it is before that bar, if any such there be, the respondent is directed to arraign the petitioner. There is no such bar known to our constitution or legal structure before which the petitioner may be arraigned for the purpose expressed in the aforesaid resolution and warrant. The concurrent resolution directs that "the president of the senate and the speaker of the general assembly be authorized and directed to issue their warrant under the hand of the president of the senate, attested by the secretary of the senate, and the hand of the speaker of the general assembly, attested by the clerk of the general assembly." I am not aware of any legal authority for the issue of such a joint warrant, nor has any authority therefor been cited to me. It appears from the proofs that the concurrent resolution authorizing the issuance of the warrant in question was not passed in the general assembly in accordance with the requirements of house rule 32, in that the ayes and nays, when duly moved, were not called for, and were not entered upon the journals of the house. *Page 50 
 AS TO JOINT RESOLUTION.
It clearly appears from the proofs in the case at bar thatSubstitute for Senate Joint Resolution No. 3 (Joint Resolution No. 13, as it is now known) was passed in violation and disregard not only of the provision of our state constitution (art. 4 §4 ¶ 6) which requires that all bills and joint resolutions shall be read three times in each house before the final passage thereof, but in violation and disregard also of the rules of the senate and general assembly with respect thereto. Article 4, section 4, paragraph 3 of the state constitution provides: "Each house shall * * * determine the rules of its proceedings * * *." Pursuant to such constitutional requirement the senate and general assembly, respectively, adopted, on January 10th, 1928, rules for the government of their proceedings. Senate rule 20 provides: "On the second and third readings of bills and joint resolutions, printed copies thereof shall be used." Substitute for Senate Joint Resolution No. 3 was not printed as required by the aforesaid rule when it is claimed to have had its second reading. Senate rule 30 provides: "Every bill and joint resolution shall receive three readings previous to its being passed; * * * which readings shall be on three different days; * * *." House rule 43 provides: "Every bill and joint resolution shall receive three separate readings in the house previous to its passage, but no bill or joint resolution shall be read twice on the same day, without special order of the house." Said resolution did not have three readings in the senate on threedifferent days as required by senate rule 30; and it did not have three readings in the house in accordance with the requirement of house rule 43. In violation and disregard of said rules it was read twice on the same day, and without special order of the house. House rule 44 was violated in that said resolution was not, after its first reading, printed for the use of members. House rule 47 was violated in that a printed copy of said resolution was not used on second reading. Neither of *Page 51 
the aforesaid rules were suspended, amended, rescinded or changed by vote of the respective houses. Senate rule 71 provides: "No standing rule or order of the senate shall be suspended unless by the consent of a majority of the senators elected, nor rescinded or amended but by the same number, and one day's notice shall be given of the motion for rescission or amendment." House rule 60 provides: "No standing rule [or order] of the house shall be rescinded or changed without one day's notice being given of the motion therefor; nor shall any standing rule be suspended except by vote of the majority of the whole number of members of the house." Counsel for the respondent urges that the decision of our supreme court in Pangborn v. Young, 32 N.J. Law 29, forecloses this court from inquiring whether the legislature in the passage of the aforesaid joint resolution complied with the requirements of the constitution, and of the rules of the senate and general assembly, applicable thereto, and that the passage thereof cannot be inquired into in this proceeding, and that the court may not go behind the certificate of the secretary of state as to the authenticity of said joint resolution. The cited case was decided in 1866, and involved a general act of the legislature — a public act. The attempt, in the cited case, was to show that the act which was approved by the governor and filed with the secretary of state, was variant from the act passed by the legislature. In view of the fact that the aforesaid case is a decision of the supreme court and never directly passed upon by our court of errors and appeals, and the decisions of courts in at least twenty-eight states (Field v. Clark,143 U.S. 649, 667; 36 L.Ed. 294, 301) have held that it is competent to impeach the journals directly; while it is held to the contrary in but nine states — including New Jersey; and the fact that the legislature of our state, subsequent to the decision ofPangborn v. Young, enacted legislation which permits our supreme court to investigate as to whether constitutional requirements were complied with in the passage of public acts; and the decisions of our courts hereinafter referred to with respect thereto, I consider, though having in mind respect for said decision, that *Page 52 
it cannot reasonably be urged that this court, and, upon appeal, the court of errors and appeals, in this era, is foreclosed from determining whether an act in question (if the joint resolution in question may be dignified as an act) has been constitutionally passed. New Jersey was the first state to establish the principle that the judiciary would inquire into the constitutionality of an act, and being empowered so to do, the court should, of course, inquire into all constitutional matters incident to the passage of such act and relating to the subject-matter thereof. The case alluded to is referred to in Taylor's Due Process of Law §218 (at p. 446), wherein the author says that at some uncertain date, prior to 1785, Chief-Justice Brearley held, inHolmes v. Walton, cited in State v. Parkhurst,9 N.J. Law 427, appendix, that a statute then in question was unconstitutional, and therefore void. In Bowman v. Middleton,1 Bay 252, the supreme court of South Carolina held, in 1792, that an act passed by the colonial legislature in 1712 wasipso facto void, because in contravention of Magna Carta.
But, whatever definite rule of law may be finally established in such respect, the decision of Pangborn v. Young is clearly, in my judgment, inapplicable to and therefore not dispositive of the question now before this court, relating to a jointresolution, and this, for reasons hereinafter mentioned. And, in the case at bar, based upon a writ of habeas corpus, which is said to be the bulwark of our liberty, all proceedings of the senate and general assembly, upon which are predicated the legality of the warrant in question should be inquired into. InPangborn v. Young, the court said: "A legislative bill, which wanted the approval of either the assembly or the senate, or that of the governor, would be so plainly defective, on constitutional grounds, that this court could not hesitate, in the exercise of its clearly legitimate power, in declaring it absolutely void. Such, indeed, in the argument, was not denied to be the inevitable result, as an induction of law, if the facts above noted were to be received and considered by the court. * * * The entire controversy, and the learned discussion at the bar which followed, and which has so materially assisted the labors of *Page 53 
the court, turned upon another point, which was the very important question whether the court, under its admitted power to inform itself with regard to the existence of the general laws of the state, was authorized to go behind the copy of a legislative act on file in the office of the secretary of state, and which is authenticated with the usual solemnities. * * * The precise point to be considered is thus advanced in the arguments of counsel: On the part of the plaintiff, it is maintained that the act, as found in the office of the secretary of state, exemplified under the great seal, is conclusive evidence of the existence and contents of the statute; while, on the other hand, it is urged that when a doubt arises or is suggested, whether, in the passage of the act, the substantial forms of the constitution have been observed, the court will satisfy itself on these points by a reference to the journals of the two houses of the legislature. In order clearly to comprehend these opposing positions, it is necessary to understand, with clearness, what the instrument of evidence is, which, by one party, is asserted to have the effect to forbid all ulterior inquiry, as well as that other instrument to which, by the other party, it is insisted the court, under proper circumstances, has the right to revert. * * *" The court, upon consideration of the question, concluded that it could not go behind the act exemplified under the great seal of the state and determined the matter upon a part of the evidence resting upon what it conceived to be necessity. The court referred to a case in England, Rex v. Arundel, and said: "No English judge, as far as I am aware, has ever dropped a hint that, as an instrument of evidence, a statute does not stand on the same level with a judgment. I think that all persons must admit that this is the rule of the common law." The chief-justice, in his opinion, finally said (at p. 44): "My general conclusion, then, is, that both upon the grounds of public policy and upon the ancient and well-settled rules of law, the copy of a bill attested in the manner above mentioned, and filed in the office of the secretary of state, is the conclusive proof of the enactment and contents of a statute of this state. and that such attested copy cannot be contradicted by the *Page 54 
legislative journals, or in any other mode." It is clearly apparent from the opinion of the court, and from the concurring opinion of Judge Elmer, that the reasoning which impelled the court to arrive at its decision was because of a chaos which, in the court's opinion, was likely to result, as to our public laws, if the court should permit a resort to the journals as evidence. It appears too (at pp. 36, 37) that the court in fact inquiredinto and examined the journals. The slovenly manner in which the journals were kept was stressed by the chief-justice, who stated that an examination of the journals revealed the fact that they were made up of entries partly in pencil, partly in ink, and of scraps in print, taken from newspapers, and then he says: "Can anyone deny that if the laws of the state are to be tested by a comparison with these journals, so imperfect, so unauthenticated, that the stability of all written law will be shaken to its very foundations?" Inasmuch as the constitution requires the houses to keep legislative journals and to make entry therein of the ayes and nays of members, particularly on the final passage of bills and joint resolutions (art. 4 § 4 ¶¶ 4, 6) can it be reasonably urged in this present era when efficiency systems are so much in effect in well regulated business, that carelessness upon the part of the officers of the houses in complying with themandatory requirement of the constitution, is to be condoned? The practices of the year 1866 ought not to be considered in this present enlightened era, and the reason or excuse so assigned by the court in Pangborn v. Young in 1866 should not be applied to-day. In following Pangborn v. Young, the supreme court of the United States, in Field v. Clark, 143 U.S. 649;36 L.Ed. 294 (at p. 305), said, quoting from Weeks v. Smith, 81 Me. 538: "The enrolled act, if a public law, and the original, if a private act, have always been held in England to be records of the highest order, and if they carry no `death wounds' in themselves, to be absolute verity, and of themselves conclusive." The court referred, however (36 L.Ed. 305), to the divergence in authority. The North Carolina supreme court, in Carr v.Coke, 116 N.C. 223; 28 L.R.A. 737, followed Pangborn v. *Page 55 Young, but there was a vigorous dissenting opinion by Judge Avery (at p. 742), wherein he referred to the notes in Field
v. Clark, supra:
"Looking at the case from the standpoint of my brethren, it appears from a brief of cases involving the question whether the ratification can be contradicted by the journal, which will be found in the notes on pages 661, 667, of volume 143 of the United States Reports [Marshall Field Co. v. Clark, 36 L.Ed. 294,301], that in twenty-eight of the states the courts have held that it is competent to impeach the ratification by the journals directly; while it is held to the contrary in but nine states. The conceded fact that in some of those states there are constitutional amendments providing that the ratification may be contradicted by the journal, shows conclusively that we have no reason to fear the threatened ills which are prophesied as probable results of going behind the ratification of an act to show that it did not pass, * * * when twenty-eight states still afford good government to their citizens, after permitting the journals to be used to show * * * that the ratified bill did not pass. * * * When the courts of more than three-fourths of the states have ventured to go behind the ratification of statutes to call in question the regularity of the successive steps preceding the signing by presiding officers, it seems to me that we may venture, * * * to look, for the analogy to govern us, rather to the views of the twenty-eight than to the opinions of the nine courts."
The divergence of opinion on the subject is indicated by the reference to the cases in the continuation of Rose's notes tothe United States Reports, Supp. vol. 3 (at p. 175). See, also, Ritzman v. Campbell (Ohio), 112 N.E. Rep. 591;L.R.A. 1916 E. 1251, wherein the Ohio supreme court held, as indicated in the head note: "A duly enrolled bill, although publicly signed by the presiding officer of each house, in the presence of the house over which he presides, while the same was in session and capable of doing business, and afterward approved by the governor and filed by him with the secretary of state, may be impeached on the ground that it has not received a constitutional majority of the members elect of both branches *Page 56 
of the general assembly, and upon this question the legislative journals must provide the appropriate as well as the conclusive evidence." In 26 Am. Eng. Encycl. L. (2d ed.) 559 it is said: "The supreme court of North Carolina has indicated a distinction which appears to be most reasonable and which may serve to a certain extent to reconcile the differences of opinion on the question of the conclusiveness of the enrolled bill. The distinction stated is this; that where the constitution contains no provision requiring entries on the journal of particular matters, such as, for example, the call of the ayes and nays on a measure in question, the enrolled act cannot in such case be impeached by the journal; but where a state constitution provides such formalities in the enactment of laws as require a record on the legislative journals, these journals are conclusive not only as against a printed statute published by authority of law, but also against a duly enrolled act." Citing Union Bank v. OxfordCommrs., 119 N.C. 214; Commissioners of Stanly County v.Snuggs, 121 N.C. 394, distinguishing Carr v. Coke,116 N.C. 223, hereinabove cited. The aforesaid distinction is clearly applicable to the case at bar because our state constitution (art. 4 § 4 ¶ 6) requires entry on the journals of each house the ayes and nayes of members voting on the final passage of bills and joint resolutions. Conceding for the sake of argument that the rule stated in Pangborn v. Young has become so settled in the jurisprudence of our state, that with respect to public laws, which was the subject to which the decision of the case related, our courts may not look behind the certificate of the secretary of state with respect thereto, such rule, in my judgment, may not be extended to a joint resolution — which is clearly distinguishable from and of less solemnity than apublic law. In considering this question it is important to note whether the courts of this state have manifested a disposition to extend the rule of Pangborn v. Young beyond its applicability to public laws. It has not been so extended. In Freeholders of Passaic v. Stevenson, 46 N.J. Law 173, it was urged, in our court of errors and appeals, that by reason of said rule the court was without authority to determine *Page 57 
whether requisite notice had been given of an intention to apply for the passage of a local law. The court held that whether the requisite notice was given of the intention to apply for the passage of such a law was a subject-matter for judicial inquiry under our state constitution (art. 4 § 7 ¶ 9), thus declining to extend said rule. In Bott v. Secretary of State,61 N.J. Law 163, it was argued that because of said rule a writ of certiorari could not issue to review a statement of the result of an election for the proposed amendment to the constitution. See the dissenting opinion of Mr. Justice Van Syckel (at p. 173), wherein he says: "The courts have no more right to challenge or controvert that decision than they have to call in question the regularity of the proceedings of the legislature in passing a statute. It is the conceded law of this state that such power does not reside in the judiciary.Pangborn v. Young, 3 Vr. 29." * * * And (at p. 174): "I feel constrained to differ with my associates, and refuse to assent to the granting of the writ applied for." The court (Messrs. Justices Van Syckle, Dixon and Collins) refused to extend the rule of Pangborn v. Young and granted the writ. The opinion of the court (Messrs. Justices Depue, Van Syckle and Garrison) on the argument of the writ (62 N.J. Law 107) discloses that the court took the view, in effect, that the writ should not have been issued, for the reasons stated by Mr. Justice Van Syckle in his aforesaid dissenting opinion. The court determined the merits, but declared that after the decision and determination of the board of state canvassers and the proclamation of the governor, the matter passed beyond the reach of the judiciary. Mr. Justice Garrison, though concurring in the result, dissented upon this proposition and said: "I agree with the decision of the court in this case. I concur in the reasons for that decision given in the opinion of Mr. Justice Depue. I do not agree that the decision the court has made is one that is beyond the cognizance of the judicial department. I dissent from the proposition that the legislature can place a question of this sort beyond the reach of the judiciary." The case then went to the court of errors and appeals (63 N.J. Law 289) wherein *Page 58 
the chancellor, chief-justice, and Messrs. Justices Collins, Dixon, Gummere, Lippincott, Adams, Bogert, Hendrickson, Nixon and Vredenburgh voted to affirm the opinion of the supreme court, and held that: "The judicial department of the government has the right to consider whether the legislative department and its agencies have observed constitutional injunctions in attempting to amend the constitution, and to annul their acts in case they have not done so." Justice Dixon, in delivering the opinion of the court, referred to State v. Rogers, 56 N.J. Law 480, 616,
and quoted from Chief-Justice Beasley in that case as follows: "When the inquiry is whether the legislature, or any other body or officer, has violated the requirements of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government." This case manifests that the court of errors and appeals declined to extend the rule of Pangborn v. Young beyond the necessity therein emphasized. In Bloomfield v. Freeholders of Middlesex,74 N.J. Law 261, the supreme court, in a case inter partes, was urged to apply the rule of Pangborn v. Young — the case falling strictly within its scope, and while the court adhered to said rule it did not do so until after a further consideration of the cases, and then again rested its application of the rule upon the ground of necessity. The court said: "The magnitude of the change that would come over our judicial system by the introduction of such a practice may be gathered from the consideration that the laws that would be thus opened to indirect attack in suits inter partes are to be numbered almost by the thousands. Between the years 1884 and 1905, alone, the number of bills thus approved by the executive after the legislature had finally adjourned was one thousand three hundred and fifty-nine, embracing almost every conceivable topic of legislation, and both before and since these dates bills that were similarly approved considerably swell the general total. From these figures alone the practical importance of the preliminary question that has been referred to us must be clearly apparent. It must also be apparent that the question at issue, being at bottom *Page 59 
a matter of evidence, must be decided solely with reference to the established principles of that branch of legal science." A condition such as mentioned by the court in Pangborn v.Young, which involved a law, cannot reasonably be applied tojoint resolutions, which, as is well known, are relatively few, and therefore, "the practical importance of the preliminary question" referred to as "clearly apparent" in the aforesaid case, is not apparent in the case at bar. In none of the cases in which the rule of Pangborn v. Young has been referred to, has the court extended the rule, and all of the cases recognize that the rule is one resting upon presumed necessity. That the legislature itself conceived that the rule of Pangborn v.Young should not be strictly applied and followed by the court in all cases affecting public laws is manifested by the fact that seven years after the decision of Pangborn v. Young, the legislature passed an act (P.L. 1873 p. 27; Comp. Stat. p.4978) providing for investigation by the supreme court, upon petition, as to compliance by the legislature with constitutional requirements in the enactment of laws and joint resolutions, notwithstanding the certification thereof by the secretary of state, and said act purports to confer upon the supreme court jurisdiction and power to proceed in a summary way and inquire into the facts and circumstances alleged as to the legality of an act or joint resolution, and after a full hearing of the facts and circumstances proved, the court, if satisfied that the law or joint resolution in question was not duly and constitutionally passed by both houses of the legislature, or duly approved by the governor, has jurisdiction and power to decree the same to be null and void. Under the authority of the aforesaid act several investigations have been made by the supreme court: In reJaegle, 83 N.J. Law 313, wherein the court, after investigation as to the facts, declared void the act in question; In re PublicUtility Board, 83 N.J. Law 303, wherein the court, after investigation as to the facts, declared void the act then in question, and the court, in said case, held that the act of March 3d 1873, is applicable to all statutes delivered either by the executive or the legislative department *Page 60 
of the government to the secretary of state, to be filed in his office, and which have thereby apparently become a part of thebody of the law of the state, thus minimizing the rule ofPangborn v. Young; In re Ross, 86 N.J. Law 387, wherein the court, after investigation as to the facts, declared valid an act then in question; In re Low, 88 N.J. Law 28, in which Mr. Justice Garrison for the court held that in determining whether a bill or a joint resolution had been duly passed or approved, the journals of the two houses of the legislature might, under the provisions of the statute aforesaid, be referred to, and, although competent sources of evidence, journals are not the only sources, and that inferences may be drawn from other evidence,aliunde the journals, e.g., the certificates by the speaker of the house and the president of the senate. The court, in said case, after a consideration of the facts adduced by the evidence, concluded that the petitioners failed to satisfy the court that the act then in question was not duly passed or approved; In rePetition of Attorney-General, 98 N.J. Law 586, wherein it is said that the court must be satisfied by clear and convincing evidence of the existence of the fact that an act complained of received a less number of votes in favor of its passage than required by the constitution, in order to justify a decree nullifying the statute. But in Ewing v. Trenton,57 N.J. Law 318, the supreme court, notwithstanding the rule of conclusiveness of the bill, as announced in Pangborn v.Young, suspended said rule in the matter concerning notice of the passage of a special act, and determined that it could inquire whether the notice of intention to apply for the passage of a private, local or special act, required by article 4, section 7, paragraph 9 of the constitution, had been given, and the court inquired with respect thereto, and finding that the constitutional requirement had not been complied with in the enactment of the law then in question, declared the act unconstitutional. Reference is made, in said case, toFreeholders of Passaic v. Stevenson, supra, wherein the supreme court held that the act then attacked was a special act, and because it was admitted that no notice of its introduction had been given, its passage was held *Page 61 
to be unconstitutional, and pointed out that the court of errors and appeals affirmed the judgment of the supreme court, but that such affirmance was by a part of the court, put upon the ground that the statute then in question was a special act, regulating the internal affairs of a county, and pointed out also that "upon the point whether it was permissible for the court to inquire into the existence of the preliminary notice, there was no deliverance by a majority of the court for or against the existence of such power of judicial inquisition." Likewise, inAttorney-General v. Tuckerton, 67 N.J. Law 120, it was held that the court might inquire as to whether a notice of intention to apply for the passage of a private, local or a special act had been given. In a note in 40 L.R.A. (N.S.) 29, the aforesaid cases of Ewing v. Trenton, and Attorney-General v.Tuckerton, are cited, together with numerous other cases, sustaining the right of the court to inquire as to compliance with constitutional requirements in the passage of private, local or special acts. In Bloomfield v. Freeholders of Middlesex,supra, the court, in applying the rule of Pangborn v. Young, referred thereto, and also to Freeholders of Passaic v.Stevenson, supra, and to Standard Underground Cable Co. v.Attorney-General, 46 N.J. Eq. 270, and said: "These decisions of the court of last resort approving and illustrating the doctrine enunciated in Pangborn v. Young constrain us to deny the right of the prosecutor in the present case to introduce evidence to contradict the certified copy of the attested statute of June 12th, 1906, and require us to give conclusive effect to such attestation as against such collateral attack." The wordconstrain in the quotation aforesaid I regard as significant, and indicative that the aforesaid rule is to be limited — as ofnecessity — to public acts, in contradistinction to jointresolutions, which, as hereinbefore and hereinafter mentioned, are clearly distinguishable from laws or statutes. Furthermore, the court, in Bloomfield v. Middlesex, supra, questioned whether the doctrine of Pangborn v. Young, which was one of collateral attack, is applicable to the direct method of attacking enrolled laws. The court says: "It may not be inappropriate to draw attention to the *Page 62 
fact that after the decision of Pangborn v. Young the legislature of this state passed an act entitled "An act providing for decreeing and making known that certain laws and joint resolutions have become inoperative and void." P.L. 1873p. 27. In Pangborn v. Young, supra (at p. 39), it is said: "The court cannot try issues of fact; nor, with any propriety, could the existence of statutes be made dependent on the result of such investigation." But, as indicated hereinabove, did
inquire into the facts, and since the legislature enacted P.L.1873 p. 27, the court does try issues of fact, and, upon its investigation thereof depends the existence of statutes the legal sufficiency whereof are inquired into. The assumption of jurisdiction by the supreme court under the act of 1873 is clearly an admission that the right to determine whether a public law or statute had been passed in accordance with the provisions of the constitution, as to the method of its passage through the senate and general assembly, always resided in the courts. It is apparent that by the passage of said act the legislature intended only to declare a rule of evidence. But it is not necessary to determine the case at bar as though it involved a public statute because we have not such a case under consideration. We are considering a joint resolution, and the attempt of the respondent herein is to extend the rule ofPangborn v. Young, which the courts have hitherto refused to extend in its application to statutes, to joint resolutions; and it is attempted to extend such rule to joint resolutions — after the legislature has indicated by its act authorizing the supreme court to go behind the certificate of the secretary of state as to conditions prescribed in the aforesaid act, that the aforesaid rule, even with respect to public statutes, is not always to be observed. The rule of Pangborn v. Young has never been applied in this state to joint resolutions, and though I have made diligent research I have been unable to find a case anywhere applying said rule to joint resolutions; nor has counsel cited any such case to me. Statutes and joint resolutions are clearly distinguishable. A statute (law) is something permanent, uniform and universal. Opinion of the Justices, 66 N.H. 629,632; 33 *Page 63 Atl. Rep. 1076. The term law, when used without restriction or qualification, refers to the public law of the state. It is not every act, legislative in form, that is a law. An appropriation bill, for instance, is not a law in its ordinary sense. Such a bill pertains only to the administrative functions of government. State v. Clausen, 85 Wn. 260, 272;146 Pac. Rep. 28, 32; Ann. Cas. 1916 B 810. A resolution of a legislative body is not a law. "The chief distinction between a resolution and a law seems to be that the former is used whenever the legislative body passing it wishes merely to express an opinion as to some given matter or thing, and is only to have a temporary effect on such particular thing; while by the latter it is intended to permanently direct and control matters applying to persons or things in general." Conley v. Texas Div. U.D.C.
(Tex. Div. A), 164 S.W. Rep. 24, 25. In S.H. Hawes Co. v.Wm. R. Twigg Co., 110 Va. 165; 65 S.E. Rep. 538, 552, the court said: "An act of congress governs all persons under the jurisdiction of the enacting power; whereas a `joint resolution' is merely a rule for the guidance of agents and servants of the government." In 26 Am. Eng. Encycl. L. (2d ed.) 560 § 18subdiv. d, it is said: "A joint resolution is described to be `a form of legislation which is in frequent use in this country chiefly for administrative purposes of a local or temporary character.'" In Rice v. State, 95 Ind. 33, it is pointed out that a joint resolution (and likewise a concurrent resolution) is less effective as to the expression of legislative will than a bill enacted into a law. A joint resolution may properly be regarded as merely a suggestion or direction in writing, concurred in by the two houses of the legislature. A legislative body may by a resolution express an opinion, may govern its own procedure within the limitations imposed upon it by its constitution or authority, and in case it have ministerial functions, may direct their performance, but it cannot adopt that mode of procedure in making laws, where the power which created it has commanded that it shall legislate in a different form. SeeCity of San Antonio v. Micklejohn, 89 Tex. 79;33 S.W. Rep. 735, 736. Under our constitution *Page 64 
a joint resolution is not placed on the same footing as abill. A bill must contain an enacting clause the form of which is prescribed by the constitution (art. 4 § 7 ¶ 5): "Be it enacted by the senate and general assembly of the State of New Jersey." A joint resolution is not dignified by such solemnity. See, also, Herbring v. Brown (Ore.),180 Pac. Rep. 328. While the state constitution (art. 4 § 4 ¶ 6) refers to both bills and joint resolutions and the requirements for the passage thereof, no provision of the constitution requires that joint resolutions must be presented to the governor for his approval or disapproval; yet, the constitution (art. 5 § 7) requires that every bill which shall have passed both houses shall be presented to the governor for his approval or disapproval. Therefore, notwithstanding that thejoint resolution in question was approved by the governor, his approval thereof does not add any value whatever thereto. There is no provision in the state constitution requiring the filing of a joint resolution with the secretary of state. Counsel for the respondent, appreciating that there is no such provision, refers to P.L. 1877 p. 1094; 4 Comp. Stat. p. 4833, which provides "that on the passage of any bill into a law, or the adoption of any joint resolution, the same shall be delivered to the governor or person administering the government, who, in case he shall approve such bill or joint resolution, shall sign and deliver the same to the secretary of state, to be filed in his office, * * *. The secretary of state shall give copies to such person or persons who shall make application for the same, which copies when certified by said secretary, under his hand and seal, to be true copies, shall be received in evidence in any court of this state, and be as good, effectual and available in law as if the original was then and there produced and proved. * * *." Such statute has not the effect of making a copy of a joint resolution filed in the office of the secretary of state conclusive evidence, unless, notwithstanding the statute, theoriginal thereof, under the rule of Pangborn v. Young, would have been conclusive evidence. Nor does the fact that the legislature, by P.L. 1873 p. 27; 4 Comp. Stat. 4978 § 43, has permitted a direct attack *Page 65 
in the supreme court on both laws and joint resolutions make such method of attack the exclusive remedy unless, notwithstanding the statute, under the rule of Pangborn v.Young, if adhered to, no attack could be made, for, as hereinabove emphasized, it must be borne in mind that the rule ofPangborn v. Young does not rest upon a statute but upon the court's declaration of necessity and the reasons assigned therefor. If, as a fact, the supreme court in any case might look beyond the certification of the secretary of state as to the authenticity of a bill the legislature would be unauthorized to pass an act taking away that right, and which would make the certification conclusive. It is not a matter within legislative control. If, therefore, the rule of Pangborn v. Young as a common law matter is not to be extended to joint resolutions, it is immaterial what legislation there may have been passed by the legislature upon the subject. In view of the distinction between bills and joint resolutions, the subject-matter thereof, the manner of their passage, the fact that every bill which shall have passed both houses of the legislature shall be presented to the governor for his approval or disapproval, and jointresolutions which shall have passed both houses of the legislature are not required to be presented to the governor for his approval or disapproval, and there being no constitutional requirement for the filing of joint resolutions with the secretary of state, though bills are required by the constitution to be filed with said officer, the rule ofPangborn v. Young, based strongly upon necessity, and the dignity to be accorded, as evidence, the certificate of the secretary of state, as to the authenticity of bills passed by the legislature and filed with the secretary of state under constitutional requirement, cannot be extended to joint resolutions. The court in Pangborn v. Young mentioned the sanctity as a matter of evidence of the bill certified by the secretary of state, and Mr. Justice Elmer referred to the fact that "all public laws * * * are considered to be known and understood, not only by the judges and officers whose duty it is to enforce them, but by every individual who is bound to obey them. * * *" Throughout all the cases on *Page 66 
the subject it is clearly manifest that it is a public law of general application which is involved. The reason for the declaration of the court in Pangborn v. Young, with respect to public laws, is clearly indicated not only by the case itself, but by Mr. Justice Garrison in Bloomfield v. Freeholders ofMiddlesex, supra (at p. 263), and the reasoning of the justice in said case does not apply to a joint resolution which cannot be classified as a law, which is adopted for a specific purpose — administrative rather than legislative — which does not require the approval or disapproval of the governor, which is not required to be filed with the secretary of state, and if filed with such officer, the latter's certification as to authenticity thereof cannot dignify it as evidence so as to warrant its being classified as a law to which the rule of Pangborn v.Young is strictly applicable. In considering whether the rule of Pangborn v. Young should be extended to join resolutions the court must be mindful of the fact that the aforesaid rule is not the rule of at least twenty-eight of the states, and that where such rule has been followed it has been followed reluctantly and only upon the ground of necessity; also, that such rule has never been extended beyond public laws, and that it has never been extended by the courts of this state.
 JOINT INVESTIGATING COMMITTEE. State v. Brewster, 89 N.J. Law 658, is inapplicable to the case at bar. It clearly appears from the proofs adduced in the case at bar that the joint investigating committee appointed under the authority of Substitute for Senate Joint Resolution No. 3 (Joint Resolution No. 13) had no legal existence, because, as hereinabove stated, said resolution was not lawfully passed, and consequently no committee could be lawfully appointed thereunder. It is claimed, in justification of the legality of the investigating committee, that it was authorized under the wording of the resolution creating it, which reads, "to make a survey of all questions of public interest;" and "to investigate violations of law;" and "to *Page 67 
investigate the conduct of any state official, state department, commission, board or body, * * *," to inquire into any andall matters concerning or in anywise relating to the municipal affairs of the cities of Jersey City, Hoboken, Bayonne, and elsewhere, and of the county of Hudson; and also activities, private business dealings, private business affairs, as well as accumulations of wealth, and property holdings, of persons holding municipal office. It was clearly not authorized so to do. It assumed unwarranted authority. Numerous instances of arrogation of assumed authority are evidenced by the proofs in the case at bar. The committee was unwarranted in investigating the petitioner, Frank Hague. It did not presume or undertake to inquire into the action or inaction of Frank Hague as mayor of Jersey City, or as one of the commissioners of Jersey City in charge of the department of public affairs of said city. It assumed authority to inquire into the personal and private business affairs of the petitioner, and into his home and living conditions, and into his real estate and other property holdings, and as to his accumulation of wealth, and into his political activities. I am not aware of any precedent in this country or in England upon which said legislative committee may justify its aforesaid inquiry and activity. The action of the committee in such respect is unprecedented and illegal. The fundamental rights of personal security and personal liberty, guaranteed to the petitioner by the constitution of our state and the constitution of the United States, were clearly violated by the legislative committee in the "fishing expedition" which the committee employed in its inquiry of witnesses summoned before it, as to the personal and family affairs of the petitioner. It is clearly manifest in the case at bar that the joint resolution under which the legislative committee whose activities resulted in the issue of the warrant in question requiring the arrest of the petitioner and his arraignment before "the bar of the senate and general assembly of the State of New Jersey," as hereinabove mentioned, does not authorize said committee to engage in such inquisition or "fishing expedition" as it prosecuted, and apparently intends to pursue. *Page 68 
The committee has assumed to act not only as investigators, but as prosecutors and judges also. It has, within its assumed authority, investigated many matters entirely beyond the scope of its authority. It assumed authority to prosecute alleged offenders for alleged crimes, submitted to grand juries alleged evidence thereof, and being incensed at the non-action of grand juries, publicly expressed disapproval thereof. The committee, it appears from the proofs, unwarrantably arrogated and exercised assumed judicial authority by adjudging the petitioner guilty
of having willfully contemned the authority of the senate and general assembly of the State of New Jersey, thus stigmatizing the fair name and reputation of said petitioner, and this, clearly without due process of law. In Greenfield v. Russel,292 Ill. 392; 127 N.E. Rep. 105, it is said:
"It must also be conceded that a state legislature has power to obtain information upon any subject upon which it has power to legislate, with a view to its enlightenment and guidance. This is essential to the performance of its legislative functions, and it has long been exercised without question. Ex parte Parker,74 S.C. 466; 55 S.E. Rep. 122; 114 Am. St. Rep. 1011; 7 Ann. Cas.874, and note. While this is true, it cannot violate the constitutional rights of any * * * individual by conducting a public and judicial investigation of any charges made against such person * * * under the pretense or cloak of its power to investigate for the purpose of legislation. This is true no matter whether the investigation be for the purpose of instituting prosecutions, for the aid and benefit of a grand jury in finding indictments, or for the purpose of intentionally injuring * * * any * * * individual. All such investigations, when judicial in character, made by the general assembly, are absolutely without authority and in violation of the constitutional rights of the parties whose conduct is so publicly investigated. Kilbourn v. Thompson, 103 U.S. 168;26 L.Ed. 377; State v. Guilbert, 75 Ohio St. 1; 78 N.E. Rep. 931. * * * The distinction between the functions of the legislative and the judicial departments is that it is the province of the *Page 69 
legislature to establish rules that shall regulate and govern in matters or transactions occurring subsequent to the legislative action, while the judiciary determines rights and obligations with reference to transactions that are past or conditions that exist at the time of the exercise of judicial power." 12 Corp.Jur. 807; Newland v. Marsh, 19 Ill. 376.
In referring to the investigation then in question the court said (127 N.E. Rep. 105):
"If the rights of private individuals * * * could be invaded by the legislature in that manner, their reputation and their character and their business would be greatly endangered if not entirely destroyed, and they would not have or enjoy in such public investigations their constitutional right of answering and make a defense to such charges, however false they might be. * * * Under such circumstances, it is the duty of the courts to protect the rights of individuals by refusing to permit the legislature to thus invade the jurisdiction of the court. A judicial investigation should at all times proceed in an orderly manner before a tribunal legally constituted to make such investigation and in such a manner as to give all parties thereby affected a complete and full hearing and an adjudication that will determine and settle the rights of the parties. An investigation by the legislature that can in no way be servicable to it in future legislation and that must necessarily endanger the constitutional rights of private individuals ought never to be made, and such an investigation is prohibited by the constitution of Illinois."
The stricture and admonition aforesaid is applicable to the case at bar. The investigating committee also unwarrantably assumed, and in fact exercised authority through the activity of its chairman, to admonish the civil service commissioners as to the duties devolving upon said commissioners incident to a competive civil service examination for the position of grand jury clerk in Hudson county, and made suggestions to said commissioners as to the conduct of their affairs. What possible justification may the committee, or the chairman, reasonably urge to sustain such activity of intermeddling? None whatever! The legislature is not empowered *Page 70 
to delegate to a few of its members the absolute power to determine for themselves the scope of the subject-matter of an investigation, and compel such persons as the members constituting said committee deem advisable to subpoena, to appear before such committee on a wide-open inquisition, with noparticular subject-matter stated for inquiry, and require such persons under the guise of an investigation having for its purpose the seeking of information for proposed legislation to disclose their private business affairs, property holdings, business dealings, accumulation of wealth, and the like — and particularly to produce bank books, c., aforesaid for the past fourteen years (in the case at bar from January 1st, 1914, to date) of himself and his wife. The delegation of power so attempted is repugnant to the due process of law clause of the fourteenth amendment of the constitution of the United States. The legislature, in the case at bar, has attempted by joint resolution to delegate to a committee therein provided for, the authority:
(1) To make a survey of all questions of public interest;
(2) To investigate violations of law;
(3) To investigate the conduct of any state official, state department, commission, board or body, * * *. Remarkable indeed is this attempted delegation of legislative authority to a committee — that is, the determination of what may be proper subjects for legislation. The legislature was required to do more than merely declare necessity to make a survey of all questions of public interest! What is meant by a survey? What are "questions of public interest?" Is the investigating committee to exercise its own discretion in determining such? And — to investigate violations of law! Why attempt to delegate any such responsibility to the committee? Why not leave such an investigation to the appropriate power — the police authorities, grand jury, and courts? And — to investigate the conduct of any state official, c.! Investigate what conduct? Investigate what state official, state department, c., c.? And for what purpose? Is the committee to be privileged to exercise its own discretion as to the subject-matters of investigation? Such authority is *Page 71 
deficient indeed — and it certainly is insufficient to warrant the committee to make the wide-open investigation it has pursued into the affairs of Frank Hague and the affairs of Hudson county. The legislature has no more power to give to a committee a roving commission to investigate any and whatever subject the committee, in its discretion, may determine to be a proper matter of investigation, than it has to give to a committee power to determine that a matter selected by it as of public interest, is to be so regarded in fact. It has no such power.
 AS TO POLITICAL ACTIVITIES OF THE LEGISLATIVE COMMITTEE.
Without referring particularly to many or all of the matters which are clearly indicative of political activities of the committee, and particularly the chairman and vice-chairman thereof, it will suffice for the purpose of this opinion, to refer to the fact that the proofs disclose that the chairman and vice-chairman of the committee throughout the hearings of the committee, and without remonstrance by the committee of any of its members, clearly indicated by their public utterances and activities that the purpose of the inquisition by the committee was far afield from and beyond the scope of the presumed authority of the joint resolution under authority of which the commitee presumed to act, and clearly indicate that the artifice of the committee was manifestly partisan in the interests of candidates for public office — the election of which they publicly advocated — in an ensuing important state and national election. There can be no possible justification urged therefor. The coalition of the vice-chairman of the legislative committee with the state committee of the political organization with which he and the chairman of the committee were allied, so clearly demonstrated by the proofs, unmistakably evidences that the full scope and purpose of the activities of the committee were political — not legislative. In my judgment, if the general purpose of the investigating committee was political, and such purpose be manifested by the proofs (and I now declare that I find the fact so to be in the *Page 72 
case at bar), and the ostensible purpose of issuing a subpoena to the petitioner, in his individual capacity, and not as a publicofficial, as clearly indicated by the subpoena, to appear before said committee during an important political campaign in which said petitioner was then engaged in opposition to the political party with which the prime actors of the investigating committee were affiliated, and this only a few days before such election, the petitioner cannot be regarded as guilty of contempt in failing to respond to such subpoena, and particularly, as I find the fact to be, because several months before the heat of such political campaign the petitioner repeatedly requested the chairman of the committee for an opportunity to appear as a witness, if he, as a public official, were to be called as a witness by said committee (he had been called about four months before — and the committee did not examine him fully — as they declared they wished to), and when, as appears from the proofs, a member of the legislative committee sought, by motion, which was defeated by a majority vote of the committee, to afford the petitioner an opportunity to appear before said committee as a witness, and for the reason also, as I find the fact to be from the proofs in the case, that when the subpoena was served upon the petitioner, a few days before such important election, and after the vice-chairman of the committee had furnished to the state committee of the political organization with which he, and the chairman, and a majority of the committee were allied, data which clearly denoted the political aspect and purpose of the contemplated inquiry of the petitioner, the petitioner addressed a letter to the chairman of the committee assigning reasons for his declining to respond to the subpoena served upon him — and expressed his readiness and willingness to appear before the committee the day after the election or at such other time the committee might designate. It will suffice for the purpose of my decision herein to refer only to such data as follows: "Hagueism;" "Hague's Realty Deals in Deal;" "Has the probe in Hudson county been worth while; has it developed evidence to support charges that the government of the county has been and still is in the hands *Page 73 
of unscrupulous politicians who are determined at all cost to feather their own nests?" "Hague the Supreme State Issue;" "Hague's Luxurious Home in Jersey City;" "Hague has been brought before the bar of public opinion by the honest citizens of his own commonwealth. This is no long distance conspiracy. It is a New Jersey house-cleaning instituted and conducted by Jerseymen for the political salvation of their state;" "Hague's Newest Blunder;" "There can be no definite elimination of Haguism, with all which it means that is distasteful alike to thinking Republicans, Democrats and Independents except by the election of * * *." The aforesaid are mere illustrations of the matters adduced by the proofs in the case at bar as to the political activities of the legislative committee, its villification of the petitioner, subjecting him to humiliation and public scorn. Most, if not all of the aforesaid data was made up in pamphlet form and mailed to speakers of the political organization with which the chairman and vice-chairman and a majority of the members of the legislative committee were affiliated, and in accordance with the avowed purpose of the vice-chairman of said committee, who furnished the data to such state committee, as a result of which the executive secretary of said state committee forwarded said data under date of October 23d 1928, by letter to speakers of said state committee wherein it is said — "Dear Republican: I have been directed by resolution of the New Jersey Republican State Committee to send you herewith the high spots so far reached by the Case Investigating Committee delving into the affairs of Hagueism in Hudson county. The state committee earnestly requests you to use this material in all of your speeches every evening during the remainder of the campaign and to direct every speaker that you can reach to do the same. The end sought is a whirlwind campaign for these two weeks in the interest of * * *." I deign to say that never in the history of the state (and very likely never in the history of the United States) has a legislative committee, while pretending to investigate for legislative purpose so flagrantly made itself an adjunct to a political organization during a political campaign. *Page 74 
Such activities of said committee, its demonstrated partisanship, and the misuse which it made of information acquired by it during the course of its investigation, all of which under the guise of seeking information for proposed legislation, is undoubtedly unparalleled. The proofs indicate that there were three proposed senate joint resolutions which contemplated the investigation of somewhat defined subject-matters, ostensibly for proposed legislation, and Substitution for Senate Joint Resolution No. 3 (now known as Joint Resolution No. 13), resulted from a blending of the three resolutions; but, as will be observed from a reading of said resolution, it omitted particularly describing with any fair degree of particularity the subject-matters for proposed investigation. As an additional reason indicating the objectionable partisan manifestations of those who effectuated the adoption of the joint resolution, concurrent resolution, and other proceedings in question, I deem it advisable to refer to excerpts from testimony taken in the hearing before me. Senator Davis, who described himself as acting majority leader of the senate, testified that both houses of the 1928 legislature had a joint conference committee, at which the joint resolution in question was mentioned. When interrogated as to the make-up of said committee he said: "The joint conference committee of the legislature is purely a party committee, consisting of nine members of the senate and nine members of the house, Republicans in this particular case. * * * It is not a committee of the house or senate. * * * It is a committee which outlines the subject of legislation and recommends subjects of legislation. * * *" Assemblyman Barrett, a member of the investigating committee, in referring to the aforesaid joint conference committee, testified: "I suppose you might call it the Republican party in the legislature." It appears, too, from the proofs, that the chairman of the legislative committee stated during the progress of the hearings by the committee, in his public appearances in advocacy of the political candidates whom he advocated the election of, that "there were two reasons why the committee was in Hudson county, the first, "We found ourselves there *Page 75 
because of the furore over the primary elections," and the second, "Hagueism has come to have a well-defined meaning in this state; it is a system that could outlast the leadership of the man whose name it carries and remain quite as detestable. It is the system that we are after." The aforesaid are but few of the matters which appear to me as clearly manifesting the ulterior purpose and illegality of the proceedings carried on by said legislative committee. This court, in a case such as now under consideration, as a trier of the facts in issue, is warranted in determining from the proofs the intent and purposes of the legislative committee as manifested by its activities and the public utterances of its chairman and vice-chairman. The old adage "Conduct speaks louder than words" is often, and I think in this case, significant.
 AS TO SUBPOENA TO FRANK HAGUE.
The subpoena directed to the petitioner required not only his appearance before the joint committee, for a purpose not particularly stated (the subpoena merely says "to testify all and singular what you know concerning the said matters under inquiry") but that he diligently search for and have and bring with him before the said committee "all bank books, check books, check stubs, canceled vouchers and banking records of all kinds of yourself and or your wife, Jennie Hague, and or of anyone else for your or her account, covering the period from January 1st, 1914, to date; all books of account, ledgers, cash books and financial records of all kinds of yourself and or your wife, Jennie Hague, and or of anyone else for your or her behalf covering the period from January 1st, 1914, to date; and all safe deposit records of safe deposit boxes rented or used by yourself and or your wife, Jennie Hague, and or by anyone else in your or her behalf covering the period from January 1st, 1914, to date." Aside from the right of the committee to require the petitionerindividually, and not as a municipal, county or state officer, to appear and testify, as aforesaid, and produce his private books, c., aforesaid, it certainly was not within the province of the committee *Page 76 
to require him to produce the books, c., aforesaid, of his wife; nor was it within the province or authority of the committee to require the production of books, c., for fourteen years past. Whatever justification there may have been for such requirement in England, and in the early history of our country, when husbands controlled in great measure the property of their wives, such a practice in this present era cannot be justified. Such an inquisition, as indicated by the aforesaid subpoena, is unparalleled in legal history and is indefensible by the legislative committee assuming authority to issue such a "fishing expedition" subpoena therefor. Even though the petitioner had appeared in response to the subpoena, and produced his own books,c., aforesaid, but failed to produce the books, c., aforesaid of his wife, he would ostensibly be chargeable by said committee with having contemned its authority.
In view of what I have stated hereinabove I have deemed it unnecessary to refer to or comment upon the cases cited by counsel for the respondent, such as People v. Keeler, 99 N.Y. 463; Anderson v. Dunn, 19 U.S. 204; Burnham v. Morrissey,80 Mass. 226; In re Chapman, 166 U.S. 661; Marshall v. Gordon,243 U.S. 521; McGrain v. Daugherty, 273 U.S. 135, as to contempt powers of a legislative body, for the reason that they are inapplicable to the case at bar. They relate to action taken bya house of the legislature (and congress) for action by such house. The case at bar is not such. None of the aforesaid cases militate against anything which was said by the United States supreme court in Kilbourn v. Thompson, 103 U.S. 168;26 L.Ed. 377. The limitations placed upon the power of either house of congress, in that case, apply with equal force to the senate and general assembly of the State of New Jersey. In that case the court (26 L.Ed. 384) said: "Conceding for the sake of the argument that there are cases in which one of the two bodies, that make together the congress of the United States, may punish for contempt of its authority, or disregard of its orders, it will scarcely be contended by the most ardent advocate of their power in that respect that it is unlimited." *Page 77 
And referring to Anderson v. Dunn, 19 U.S. 204, the court says: "But we do not concede that the house of congress possesses the general power of punishing for contempt. The cases in which they can do this are very limited, * * *. If they are proceeding in a matter beyond their legitimate cognizance, we are of opinion that this can be shown, and we cannot give our assent to the principle that, by the mere act of asserting a person to be guilty of a contempt, they thereby establish their right to fine and imprison him beyond the power of any court or any other tribunal whatever to inquire into the grounds on which the order was made." The right of the court to determine that fact is sustained by the court. The court also said, in the aforesaid case that there exists no general power in congress, or ineither house, to make inquiry into the private affairs of acitizen. See, also, In re Barnes, 204 N.Y. 108.
For the reasons aforesaid I conclude that the proceedings of the legislature in the passage of the joint resolution aforesaid, and the appointment of a joint investigating committee thereunder, and the subpoena issued by said joint legislative committee to Frank Hague, and the action of said joint investigating committee in adjudging the petitioner guilty of contempt of the legislature, as indicated by the report submitted by said committee to the senate and general assembly, and the adoption by the legislature of said report, in so far as it implies an adjudication of contempt against said Frank Hague, and the proceedings of the legislature in the passage of the concurrent resolution aforesaid, and the warrant based upon the authority of the aforesaid concurrent resolution requiring the arrest and detention of the petitioner, Frank Hague, and under all proceedings thereunder, are illegal, and therefore void. The petitioner, therefore, in my judgment, is entitled to be discharged. I will advise an order accordingly. *Page 78