In the matter of the application of FRANK HAGUE for a writ of *habeas corpus*.

[Decided May 19th, 1930.]

*Mr. Russell E. Watson,* for the appellant.

*Mr. Merritt Lane,* for the respondent.

The opinion of the court was delivered by

GUMMERE, CHIEF-JUSTICE.

The legislature of 1929 adopted a supplemental resolution appointing a joint committee, the members of which were specifically named therein, and requiring it to "make a survey of all questions of public interest; to investigate violations of law and the conduct of any state, county or municipal official, state, county or municipal department, state, county or municipal commission, state, county or municipal board, or state, county or municipal body, to report whether the functions of such officials, departments, commissions, boards and bodies have been or are being lawfully and prop-

erly discharged, for the purpose of obtaining information relative thereto as a basis for such legislative action as the senate and general assembly may deem necessary and proper."

In the conduct of the investigation made by the committee pursuant to the mandate of this resolution, it appeared that in certain condemnation proceedings, two of which were instituted by the Hudson county board of freeholders and the other by the city of Jersey City, the condemning agencies were compelled to pay for the property acquired more than half a million dollars in excess of the value thereof a comparatively short time before the institution of the several proceedings. As is stated in the brief of counsel appearing before us on behalf of the legislature, the tremendous financial gain accruing to those involved, compelled the conclusion that public moneys were wasted as a result of a conspiracy which was operated under cover of legal form. The investigation also disclosed that the proprietors of moving picture theatres in Hoboken and in Jersey City paid large sums of money for the purpose of inducing the municipal agents of these cities to refrain from enforcing the Sunday closing laws. The moneys so paid during the four years preceding the investigation by the joint committee amounted to over $200,000. The examination of witnesses by the committee further disclosed that owing to the illegal manipulation of bus franchise fees in the city of Jersey City, that municipality, during the three years and a half preceding the investigation, was defrauded of taxes approximating $35,000.

Having ascertained these facts, the committee then subpœnaed as a witness Frank Hague, the mayor of Jersey City, and after a preliminary examination, asked him the following ten questions, each of which he refused to answer:

1. Now, during the years 1922 and 1923 did you have a bank account in the National City Bank of the City of New York? 2. What bank accounts did you have during the years 1922 and 1923? 3. During the years 1922 and 1923, what was the total amount that you had on deposit in banks? 4. During the years 1922 and 1923 what was the largest amount you had in hand in cash? 5. Now, in 1923 you pur-

chased a property at Deal, New Jersey, in the name of John J. McMahon as dummy for $30,000. The purchase price was paid by John Milton's check and you reimbursed John Milton in cash. Where did you get that cash? 6. Now, in 1926, Mr. Hague, you purchased property at Deal, New Jersey, in John Milton's name as dummy. The purchase price was $65,000. Mr. Milton paid for it with his check. You afterwards reimbursed Mr. Milton in cash. In 1927 you improved that property and spent on it $59,520.50. The payments were made by John Milton's checks as the work progressed, you reimbursed him in cash. Where did you get the $65,000 and the $59,520.50 with which you reimbursed Mr. Milton in cash? 7. Did you have all of that money in any bank or banks? 8. Now, in this connection, let me ask you where you got the money with which you purchased the Deal property for $65,000 in cash and improved it in the amount of $59,520.50, which you paid in cash? 9. In 1926 you acquired a property on Gifford avenue, Jersey City, at a cost of $27,500. The title was taken in the name of Thomas McNulty as a dummy and the purchase price was paid by John Milton's check. You thereupon reimbursed John Milton in cash. Where did you get that $27,500? 10. Mr. Hague, in what bank or trust companies or other financial institutions did you maintain accounts while acting as mayor since 1921?

Upon the refusal of Hague to answer any one of these questions, the joint committee reported that fact to the legislature. Thereupon a joint session of the legislature was called. Hague was subpœnaed to appear before it, and upon his obeying the mandate of the subpœna, the questions which he had refused to answer were again submitted to him by the joint session and he again refused to answer any of them. Based upon this refusal the joint session adjudged him in contempt, caused a warrant for his arrest to be issued and directed that he be confined in the common jail of the county of Mercer until such time as he should make known to the chairman of the said joint committee in writing that he was willing to answer the questions already recited. His arrest

followed the issuing of the warrant, and he applied to Vice-Chancellor Fallon for a *habeas corpus*, praying that he be discharged from custody upon the ground that the warrant was illegally issued. Upon the hearing had upon this application, the vice-chancellor concluded that the arrest of Hague was without legal justification and ordered him discharged. Thereupon the legislature, through its agent, the sergeant-at-arms, who was entrusted with the execution of the warrant for Hague's arrest, appealed to this court from the order of discharge.

The fundamental question involved in the determination of this appeal is whether in the submitting of these questions the legislature was exercising a function vested in it by the constitution, or was invading the judicial department of the government. Article III of our constitution declares that "the powers of the government shall be divided into three distinct departments—the legislative, executive, and judicial; and no person or persons belonging to, or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

As will have been noted, the resolution under which all of these proceedings were had provided among other matters that the joint committee should "investigate violations of law and the conduct of any state, county or municipal official or department, &c., and report whether the functions of such officials or departments have been or are being lawfully or properly discharged."

The principal function of the legislature as a governmental agency of the people is to enact laws. The principal function of the judiciary is to enforce existing laws; and also to investigate through a grand jury alleged violations of law which involve criminality, and, when such investigation discloses the existence of such violations, to punish the guilty party.

In the present case the questions which were put to Hague at the joint session by Mr. Watson, the counsel of the legislature, were asked by him, as he stated to a member of the senate at the time they were put to the witness, for the pur-

pose of showing that the profits which had resulted from the criminal conspiracies with relation to the condemnation proceedings, the bus franchises, and the theatre privileges, were deposited in bank by Hague. In other words, that Hague was a party to the criminal conspiracies which resulted in the mulcting of the treasuries of the county of Hudson and the city of Jersey City of approximately three-quarters of a million dollars. Manifestly the questions with relation to the purchases of real estate by Hague were put for the same purpose. The questions were within the scope of the resolution which directed an investigation of violations of law by county or municipal officers; but, as has already been stated, investigations of alleged violations of the criminal law are strictly judicial in their nature, and, under the constitution the legislature has no more power to conduct such investigations than has the governor, who constitutes the third branch of our governmental system, even if the latter desired the information sought for the purpose of advising the legislature with relation to changes in our criminal laws that would make violations thereof by county and municipal officers less likely to occur. In refusing, therefore, to answer these questions, relating as they did to matters, inquiry into which was outside of the jurisdiction of the legislature, Hague was exercising a legal right, and this being so the legislature was without power to punish him for such refusal, for, as was stated by Mr. Justice Miller in the case of *Kilbourn* v. *Thompson, 103 U. S. 190:* "No person can be punished for contumacy as a witness before the legislature unless his testimony is required in a matter into which the legislature has jurisdiction to inquire."

It is not intended to be intimated by what has been said that the legislature is entirely without power to exercise any judicial function. The last clause of the constitutional provision which has been above recited indicates the contrary. For instance, where a member of the legislature or a state officer is charged with the commission of a criminal offense which, if true, would justify his impeachment, the house of assembly has full power to examine into the truth of the

charge, and, if the evidence taken by it justifies such action, to institute impeachment proceedings based thereon; and the senate, on the hearing of the impeachment proceedings, exercises the same judicial function under the power conferred upon it by the constitution. It may also be conceded that where a charge involving the swindling of the state out of its property is brought to the attention of the legislature, that branch of the government has constitutional power as the guardian of the state's property to investigate the truth of the charge for the purpose of recovering, if possible, property of the state of which it has been fraudulently deprived. But neither of these judicial functions, which under the constitution are vested in the legislature, has any bearing upon the question now before us.

But even if we had considered that the legislature was authorized by the constitution to investigate the criminal charges against Hague which were the basis of the questions put to him, we would not, as a result of such determination, conclude that such authority conferred upon the legislature the power *to compel* Hague to answer them even though by doing so he admitted inferentially that he was a party to the criminal conspiracies above referred to. That in the issuing of the warrant the legislature attempted to exercise this untrammeled power of compulsion is demonstrated by the language of the warrant. The mandate thereof is that he be confined in the common jail of the county of Mercer until such time as he should make known to the chairman of the joint committee in writing that he was willing to answer these questions. In other words, he is to remain confined in the county jail until he expresses such willingness without regard to whether or not the answers would incriminate him. By so ordering the legislature disregarded one of the foundation principles of our law, which is thus stated by Mr. Justice Bradley, delivering the opinion of the court in the case of *Boyd* v. *United States, 116 U. S. 631.* "Any compulsory discovery by extorting the party's oath to convict him of crime is contrary to the principles of a free government. It is abhorrent to the instincts of an American. It may suit the

purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." And again on page 638 of the opinion the learned jurist declares that: "A witness as well as a party is protected by the law from being compelled to give evidence that tends to incriminate him."

The conclusion reached by the court is that the order under review should be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, BODINE, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ. 10.

*For reversal*—BLACK, J. 1.