TOWNSHIP OF NORTH BERGEN, A MUNICIPAL CORPORA-TION, PROSECUTOR, v. JOHN F. GOUGH, WILLIAM E. SEWELL, NEALE RANSOM, WILLIAM H. BOARDMAN AND HARRY BRAVERMAN, RESPONDENTS.

Argued October 9, 1930—Decided March 21, 1931.

Before Justices CASE, DALY and DONGES.

*John F. Gough, pro se.*

For William H. Boardman, *William E. Sewell,* and *pro se.*

*Neal Ransom, pro se.*

For Harry Braverman, *Merritt Lane.*

For the prosecutor, township of North Bergen, *Edward A. Markley.*

The opinion of the court was delivered by

CASE, J.   The proceeding is on writ of *certiorari* to review an order made on July 31st, 1930, by Mr. Justice Campbell, granting allowances in a proceeding entitled "In the matter of the application for a summary investigation into the financial affairs of the township of North Bergen, county of Hudson, State of New Jersey." The investigation had been made on the order of Mr. Justice Kalisch after he had conducted a preliminary hearing. The order for the summary investigation embraced the appointment of John F. Gough to prosecute the investigation and William E. Sewell, a counselor-at-law, to prepare and present the evidence. It was followed by other orders by the same justice, directing the issue of subpœnas. Mr. Justice Kalisch died before the report of the investigation was rendered to him and before making the allowances. He was at the time of instituting the investigation, and continuously thereafter until his death, the justice assigned by the Supreme Court to the Circuit of Hudson county, within which the township of North Bergen lay. At his death his successor in such assignment was Mr. Justice Campbell. The order under review was made by Mr. Justice Campbell while he was acting under that assignment. The order was based upon, *inter alia,* a comprehensive and voluminous report by Mr. Gough and several bound volumes of testimony taken before him. It directed the prosecutor to pay to Mr. Gough the sum of $51,630.75, and to William E. Sewell the sum of $10,447.50; the allowance to the former being inclusive of $5,000 for his personal services, $35,000 for

the services, expenses and disbursements of Harry Braverman, auditor; $1,728.75 for the services and expenses of William H. Boardman, engineer, and $9,902 for the services of Neale Ransom, stenographer. The proceeding was under the statute entitled "An act to provide for the summary investigation of county and municipal expenditures." *Pamph. L.* 1907, *p.* 12, as amended by *Pamph. L.* 1911, *p.* 620; 1 *Cum. Supp. Comp. Stat., pp.* 136, 735, supplemented by a further act passed in 1911, 1 *Cum. Supp. Comp. Stat., pp.* 136, 736a.

The first point made by the prosecutor is that Mr. Justice Campbell had no authority to make the order. Section 1 of the 1907 statute provides that "if twenty-five freeholders * * * shall present to any justice of the Supreme Court an affidavit * * * that they have cause to believe that the moneys of such (municipality) * * * have been unlawfully or corruptly expended, it shall be the duty of such justice * * * to make a summary investigation * * * and at his discretion he may appoint experts to prosecute such investigation, and may cause the results to be published in such manner as he may deem proper; it shall be the duty of the officers * * * to obey any orders of such justice for facilitating such investigation and any refusal * * * may be punished by such justice as for contempt; the costs incurred under this act shall be taxed by said justice and paid upon his order by the disbursing officer * * *. The argument is that the statute is personal to the justice who instituted the proceedings and that inasmuch as Mr. Justice Kalisch initiated the inquiry he, and he alone, could thereafter make an order effective therein. In support, the prosecutors cite the liberty of the freeholders to make their application to *any* justice and the limitation of subsequent statutory reference to "such justice" and "said justice." A necessary corollary to this argument is that such a proceeding not only dies if and when the justice who started it dies, but that it becomes disabled with his disability, and is dissolved by the termination of his official tenure; this, too, without regard to the stage which the proceedings shall have reached, the nature or extent of the information obtained, or the

silence imposed by the lack of an authoritative order to publish the results.

If we were confined to a literal and strictly grammatical interpretation of the words of the statute, the prosecutor's point would have force. But we should interpret the statute, within necessary limitations, according to its purpose, keeping in mind the evil that was aimed at and the remedy sought to be applied. It has long been a major rule of construction to ascertain not merely from the single clause in which the language may be, or indeed from the entire statute, but from the common law and other laws *in pari materia* what the evident intention is. *Brown* v. *Wright,* 13 *N. J. L.* 240. "It is a clear rule that such construction ought to be put upon a statute 'as may best answer the intention which the makers had in view.'" *Thompson* v. *Egbert,* 17 *N. J. L.* 464.

The statute in its essence has been on the books for more than fifty years. *Pamph. L.* 1879, *p.* 27. It was said in *Hoboken* v. *O'Neil,* 74 *N. J. L.* 57, that "this statute is evidently a very useful act. It enables those entitled to know to ascertain the true condition of municipal expenditures."

The statute is no less useful now than then. The legislature clearly meant this statute to be the channel whereby a minority, having reason to suspect the unlawful or corrupt use of the moneys of the municipality, may present their apprehensions to a justice of the Supreme Court whereupon that high judicial officer shall make an investigation and thereupon, if he be satisfied of the propriety of so doing, may at his discretion appoint others, experts, to prosecute the investigation. There was thus set up a *quasi*-judicial method, not of charging an offense or causing trial thereof, but of ascertaining, and if so the judicial officer should determine, of publishing the facts of a very particular and vital phase of governmental activity, namely, the handling of public funds. In any event the investigation may be regarded as an effort to ascertain the truth of a charge involving the swindling of the government out of its money, and this, as was indicated in *Ex parte Hague,* 150 *Atl. Rep.* 322, is a proper subject of inquiry.

It is not to be assumed that a Supreme Court justice, with the volume of work necessarily resting upon him, can take the time, personally, to examine fully into a complicated system of modern municipal financing and, if there be concealed irregularities, to sift through skillful efforts at deception. Being satisfied, by such preliminary inquiry as he personally may make, of the occasion for an extensive investigation, he must almost of necessity exercise the discretion vested in him by the statute and appoint others to prosecute the investigation. Again almost of necessity, where the municipality is of considerable size and has diverse financial activities, the investigation must be made by experts and may run into large sums of money. What competent person will devote his time and money to an investigation of this character if at any moment, even following the completion of his labors and the expenditure of his personal funds or the assuming of obligations to others for necessary assistance in the undertaking, the death, incapacity, resignation or failure of reappointment of the justice will make compensation impossible? The anticipation of such a development as is now before us would sound the death knell to any considerable investigation. Few persons, without an ulterior motive, would be willing to gamble thus with their time and money. The statute will be palsied unless those who serve faithfully under court direction may expect that the power of directing compensation will survive the death or disability of the appointing justice.

All acts of the legislature are performed in contemplation of existing laws. *Little* v. *Bowers,* 46 *N. J. L.* 300, 304; *affirmed,* 48 *Id.* 370. It may fairly be assumed that the legislature, in passing the original statute, and in using the language "any justice of the Supreme Court," and "such justice," had in mind the then existing legislation entitled "An act relative to the Supreme and Circuit Courts," approved March 27th, 1874, Revision 1709-1877, page 216, and that in re-enacting the statute for summary investigation in 1907, and in supplementing it in 1911, it had knowledge of the continued existence (2 *Comp. Stat., p.* 1711) of the salient

provisions of the legislation just cited. The assignment of a particular justice to transact the Supreme Court functions with respect to the peculiar business of a given judicial district, with full authority to "any other of said justices" to sit if the assigned justice be prevented, and the authority to make a new assignment whenever the business of the courts may render it necessary were matters known to the legislature and may well, in the legislative mind, have been correlated to the statute for summary investigation. It is to be observed that no decision of guilt or innocence, no rights of persons or property were awaiting to be determined by the justice, dependent upon evidence taken before him. No such function devolved upon him. His paramount act of discretion upon the data submitted to him, namely, the making of the order for the investigation, had been performed, as had also that secondary but essential act, the naming of an expert to conduct the investigation and of a counselor-at-law to prepare and present the evidence. The investigation thence forward was being conducted by others and not in his presence. The report, when it should come, with its accompanying evidence, would need to be considered on its contents and its intrinsic worth, as to whether it should be published, and if so, in what manner. That was a function which, it would seem, did not, so far as concerns any inherent factor of justice, require the personal attention of the judicial member who originated the proceeding. The pressing question, however, is the making of compensation to those who labored. The proposal that the legislature did not mean to continue the vitality of the statute in this respect beyond the official activity of the justice who instituted the proceedings seems unjust, wasteful and absurd. It was said in *State* v. *Clark*, 29 *N. J. L.* 96, that "if a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed."

Prosecutor, to sustain its argument, would disassociate the proceedings, in all of its aspects, from the Supreme Court,

as a court. It asserts that the nominating of a Supreme Court justice as the controlling official is merely a form of nomenclature to indicate the class from which shall be selected an individual thenceforth to be separate and apart from the court, and thenceforth to constitute a distinct statutory tribunal which can function only as he, personally, functions. That, too, is an assertion which is not without contradiction in the statute.

In giving a legal construction to legislative enactments, the context and the whole act are to be regarded in ascertaining the mind of the legislature; the entire subject-matter, and the policy of the law, are often invoked to aid in the interpretation. *State, ex rel. Kelley* v. *Mayor, &c., of Paterson,* 35 *N. J. L.* 196. The 1911 supplement (2 *Cum. Supp. Comp. Stat., pp.* 136, 736a) provides that the justice of the Supreme Court who may have ordered such a summary investigation, may make order awarding process of subpœna, or subpœna *duces tecum,* the same to issue—not from him as an exclusive statutory tribunal, but—out of the Supreme Court, by the clerk of and under the seal of that court, and that the order of the justice regarding such subpœnas shall be filed in the clerk's office of the Supreme Court, and that it shall also be the duty of the clerk of the Supreme Court to issue, under the seal of the court, such other or further order in reference to the examination, appearance, production of books, papers or documents upon such examination, as such justice shall direct. Consequently, while the question is not without its difficulties, we are constrained to think that a proceeding under the statute is not completely outside the Supreme Court structure

We find that the legislative intent was to authorize an investigation under the direction of a justice of the Supreme Court as such, which investigation should be, to some extent, within the province of the Supreme Court as evidenced by the use of certain of the writs of that court, of its office and of its clerk. We conclude that Mr. Justice Campbell, having been assigned at the death of Mr. Justice Kalisch to succeed the latter in the Hudson Circuit, within which the prosecutor

was located, the investigation being in the posture which we have already described, had the authority to assume control over and make disposition of the allowances. The report and the evidence were before him. They were enough to sustain his exercise of discretion. He had the material from which to ascertain—if it was necessary for him to ascertain—that the contention of the freeholders was sustained and that the proceeding was beneficial to the municipality. We deem it unnecessary for him to have made a formal determination on those points. The prosecutor had advance notice of the application for allowances.

Prosecutor's points two, three and four are directed to the proposition that the order could not lawfully be made in favor of certain of the payees designated therein or against the prosecutor. The statute authorizes the appointment of experts; the order of Mr. Justice Kalisch appointed Gough, naming him as an expert, and also appointed Sewell, not mentioning him specifically as an expert but quite clearly naming him as one such; and an expert, by virtue of his profession and the function to which he was designated, Sewell surely was. It was to these experts, so appointed, that the prosecutor was directed to pay the allowances. That Gough was directed as to the specific amounts he should pay therefrom to those who had served him is a detail that does not injuriously affect the prosecutor and is not inconsistent with the letter or the spirit of the statute. These persons, for Gough, did the work and they, through him, are entitled to be paid, the order having so directed.

Point five is that certain of the allowances are for contingent future services. We find otherwise. The compensation is for services performed, expenses incurred and disbursements made. We hold that these items are embraced within the word "costs" as used in the statute and that the allowance thereof is comprehended within the power to "tax," which also by the statute is lodged with the justice. *Baldwin* v. *Freeholders*, 58 *N. J. L.* 285. The obligation placed upon Braverman and Boardman to assist in future prosecutions, should there be such, without further compensation,

are simply additional burdens placed upon these men. It is for them, not for the prosecutor, to object to this requirement.

The next, and final, point urged by the prosecutor is that the legislation itself is unconstitutional. Our conclusion is adverse to this contention also. The statute as originally passed (*Pamph. L.* 1879, *ch.* 15, *p.* 27; *Gen. Stat., p.* 2238; *Pamph. L.* 1898, *ch.* 97, *p.* 155) was pronounced constitutional. *Hoboken* v. *O'Neil,* 74 *N. J. L.* 57; *Park Ridge* v. *Reynolds,* 74 *Id.* 449. No new constitutional question is presented by the re-enactment.

We find that the order under review was properly made. The writ of *certiorari* will be dismissed.

It is moved by John F. Gough, *pro se,* that Mr. Justice Campbell be directed to file, as a part of the proceedings upon this *certiorari,* the report filed with him on May 31st, 1930. We are not informed upon what procedure or authority we are expected to make such an order; nor is the court aware of any law or practice under which such an order should issue. Moreover a copy of the report was, without opposition from the prosecutor, lodged with the court at the time of the argument. The motion will be denied.