The petition of Stegman, Duffy, Doyle, Lalor, Byrne and Tully, residents of the city of Newark, and citizens of New Jersey, was presented to the court alleging that they had been arraigned in the Essex quarter sessions on November 25th, 1932; they had pleaded not guilty; the court had fixed bail in the case of each of the petitioners at an excessive amount; the court had denied application to reduce the bail; the amount of bail resulted in a violation of the state constitutional provision that "excessive bail shall not be required, * * *." The petition concludes with the usual prayer. No question was raised as to the joint application and a single writ.
The court was requested to hear the application at six P.M. It set the time for eight P.M. and notified the prosecutor of the pleas. It was informed that neither the prosecutor nor any representative would be present. The court of chancery has no stated hours at which it will entertain applications for orders or writs. Such applications when proper may be made at any time. "The court of chancery shall be considered as always open for the granting and return of writs, and for making all orders and decrees, interlocutory or final." P.L. 1902 p. 510; 1 Comp.Stat. p. 411.
Of all the writs known to common or statute law that of habeascorpus is the most important for to it the citizen must look for relief against illegal imprisonment and perhaps worse. It goes in favor of the meanest criminal if illegally confined and to the highest official exercising the power of confinement and relieves against illegal restraint by order of the highest authority. Application for it should and must be heard at any hour of the day or night. The application for a writ in the second HagueCase, 105 N.J. Eq. 134; affirmed, 9 N.J. Mis. R. 89;150 Atl. Rep. 322, was made and the writ granted after midnight. The application for a writ in the Selzer Case, confined for contempt of the state senate, was made in the United States district court after midnight and heard until after three in the morning *Page 75 
and the writ denied upon the merits of the application. The United States district court for this district has recognized the importance of speedy action on applications for habeas corpus
by its rule which provides that: "Only writs of habeas corpus
will be heard elsewhere than in open court or at the chambers of the judges."
The writ was allowed and sealed and thereupon counsel for petitioners made application for the release of petitioners on bail pending a hearing on the writ. The court ordered that petitioners be permitted to give bail on the writ to the chancellor in the amounts set for each by the order, the bail to be approved by either of two special masters named in the order. Bail duly approved by a special master was given.
The proceedings were based on the common law — not upon the statute — and the inherent jurisdiction of the court of chancery was invoked. See Crowley's Case, 2 Swans 3; 36 Eng. Reprint 514;Case of Sheriff of Middlesex, 11 Al. E. 273; 113 Eng. Reprint419; In re Rigg, 95 N.J. Eq. 341; In re Justus (Okla. Crim.Court of Appeals), 104 Pac. Rep. 933; 25 L.R.A. (N.S.) 483
(at p. 491); In re Thompson, 85 N.J. Eq. 225; In re Hague,104 N.J. Eq. 31.
On November 28th, 1932, a motion was entertained by the court made on behalf of the state by the prosecutor of the pleas of Essex in the presence of counsel for petitioners to vacate the order admitting petitioners to bail pending the proceedings on the writ. The motion was denied. Chancellor Walker, in In reThompson, 85 N.J. Eq. 225, said: "By the common law, upon the return of a writ of habeas corpus and the production of the body of the party suing it out (the production of the bodies of petitioners in the case at bar had been waived) the authority under which the original commitment took place is superseded. After that time, and until the case is finally disposed of, the safe-keeping of the prisoner is entirely under the control and direction of the court to which the return is made. The prisoner is detained, not under the original commitment, but under the authority *Page 76 
of the writ of habeas corpus. Pending the hearing he may be bailed de die in diem, or be remanded to the jail whence he came, or be committed to any other suitable place of confinement under the control of the court. He may be brought before the court from time to time by its order until it is determined whether he shall be discharged or absolutely remanded." See, also, In re Hague, 104 N.J. Eq. 31; Barth v. Clise, 12 Wall.
(U.S.) 400; 20 L.Ed. 393.
On the date fixed for the return to the writ on November 29th, 1932, a formal return, in writing, was made by the respondent, the sheriff of Essex county, who had had custody of petitioners and to whom the writ had gone. Petitioners filed a traverse restating the matters set out in the petition and adding others. Petitioners are not restricted to the reasons alleged against the legality of the imprisonment set up in their petition. The court held in In re Thompson, 85 N.J. Eq. (at pp. 248, 256), andIn re Hague, 104 N.J. Eq. (at p. 40), affirmed by an equally divided court 104 N.J. Eq. 369, that when a person petitions for a writ of habeas corpus out of this court he commences a suit in this court. The return is a response to the writ. The allegations in the petition are made for the purpose of obtaining the allowance of the writ. The petitioner may traverse the return and in the traverse, which is his pleading, may allege any matter, whether set up in the petition or no, which would tend to show the imprisonment to be illegal. To that traverse the respondent may, and if the technical rules of pleading are to be observed, must reply, if new facts are set up, otherwise the allegations as to those new facts may be deemed admitted. The court will not apply that technical rule in the instant case but will consider the allegations of the traverse denied, which was the course pursued in In re Hague, 104 N.J. Eq. 34 (at p.140). The pleadings afford a wide scope of inquiry, and on the hearing considerable testimony was taken. The procedure thus had is supported by State v. Baird, 18 N.J. Eq. 194; Richards v.Collins, 45 N.J. Eq. 283; 29 Corp. Jur. 163, 164; In re Hague,104 N.J. Eq. 31. *Page 77 
The evidence shows that petitioners were originally apprehended and imprisoned without complaint first being made and without warrant issued thereon, and were held incommunicado for days on the order in writing of the prosecutor of the pleas which reads as follows:
"To the Sheriffs of the County of Essex:
Please detain in custody for appearance before Grand Jury the following persons: Max Stegman, Charles Byrnes, Philip B. Tully, Abraham Freund, Harry Doyle, Francis P. Lalor.
 JOSEPH L. SMITH, Office of the Prosecutor of the Pleas."
Relatives and friends were denied access to petitioners. Petitioners were not informed of the accusation against them although entitled under the constitution "to be informed of the nature and cause of the accusation" if any against them. Counsel were denied the right to speak with them.
In this situation, after several days, one of petitioners, Charles H. Byrne, applied to this court (Vice-Chancellor Backes, sitting for the chancellor) for a writ of habeas corpus which was allowed, and, on the return, the prosecutor of the pleas represented that the petitioner had been indicted and would be arraigned in open court that afternoon.
On November 25th, 1932, at two P.M., petitioners were arraigned in the quarter sessions of Essex county on an indictment charging that on the 15th day of November, 1932, at Newark, in the county of Essex, they did conspire, confederate and agree together to unlawfully steal, take and carry away, mutilate and destroy certain ballot boxes and the ballots therein contained cast by the voters of the city of Newark during the general election held on November 8th, 1932, contrary to the form of the statute in such case made and provided. The crime thus described is by the statute made a misdemeanor.
After petitioners had pleaded not guilty, counsel applied to the quarter sessions to fix and admit petitioners to bail. The stenographic record of what the judge of the quarter sessions said at the time of fixing bail was introduced in evidence without objection and is as follows: *Page 78 
"In view of the large amount of bail which the court intends to fix in this case and in other similar ones, the court deems it proper to state its reasons for so doing.
"From such information as the court at present has at hand, it would seem that the purpose of the almost simultaneous theft of the ballots from the city hall and the poll books from the office of the commissioner of elections, was a common one, to wit: To cover up election frauds in the third and fifth wards of the city. It is not probable that the alleged conspiracy, to which this lieutenant of police is charged to be a party, had its inception in, or received its momentum from, his brain. No reason why he should be the originator of this double undertaking suggests itself to the court from the facts now before it; he was apparently not in a position to benefit directly by the disappearance of the ballots and poll books per se. On the contrary the inference promptly arises that some other person or persons having something directly to gain by the disappearance of both poll books and ballots instigated the undertaking and engineered or caused it to be engineered to a successful conclusion with potent corrupting power and almost incredible daring. This officer is said to be one whose antecedents have been creditable and whose connections are good. Such a man is liable at any minute to revert to his former ideals and better self. To his instigators and corruptionists his presence is a constant risk for obvious reasons, and they may be relied upon to see to it that he is kept under a powerful incentive to disappear.
"The defendant having been indicted by the grand inquest for conspiracy to steal the ballots, though presumed to be innocent on the trial of the indictment, is presumed to be guilty on an application to fix bail thereunder.
"I have already indicated my views with reference to crimes of this nature in my charge to the grand inquest, giving into their charge the present investigation, and in view of the considerations already recited and the extreme seriousness of the crime charged, the defendant's bail will be fixed at $25,000. *Page 79 
"Mr. Smith: May I ask your honor that the approval of that bail be submitted to the prosecutor's office?
"The court: Well, that is the custom of regular routine. There is no reason why you should not proceed in the same manner."
The court then fixed bail in the case of petitioners as follows:
 Charles H. Byrne ......................... $25,000.00
 Max L. Stegman ........................... 30,000.00
 Peter J. Duffy ........................... 20,000.00
 Harry J. Doyle ........................... 20,000.00
 Francis P. Lalor ......................... 20,000.00
 Philip B. Tully .......................... 20,000.00

The evidence shows that the court on a motion to reduce the amount of bail said:
"I can assure you that the court has not fixed this bail with any precipitancy, but has considered the matter carefully, and while the bail is unusually large, the crime is unusuallyserious and its consequences are greater and more far-reachingthan the ordinary murder case to which you refer, in the opinionof the court. The court has fixed the bail at $30,000, and there it will remain."
The quarter sessions stated that it was proceeding upon "information" which it claimed to have received (but certainly not in a trial or proceeding and from the lips of witnesses sworn) to the effect that petitioner Byrne, a police lieutenant, was not the originator of the conspiracy and had been in no position to benefit by the disappearance of the stolen ballots and boxes, and that the inference had arisen in the court's mind that some other persons, having something to gain by the alleged crime, had instigated the undertaking. The court stated that, since the antecedents of the defendant Byrne were good, he was liable at any minute to revert to his "former ideals and better self," and that "to his instigators and corruptionists" his presence was a constant risk for obvious reasons, and that the court would delegate to the prosecutor of the pleas the approval of the bail submitted and that that was the custom and regular routine. *Page 80 
The prosecutor of the pleas stated before this court, during the hearing on the writ, that "what was done in this case, your honor, has been the practice in our court for over six years, to my knowledge, that I have been prosecutor," referring at the time to the delegation by the court to the prosecutor of the pleas of the power to approve bail.
The proofs show that, when petitioners tendered to the prosecutor a bonding company to go the bail in the amounts fixed by the court the prosecutor required that the surety company furnish him with (1) a list of all outstanding bonds in the county and state; (2) a list of all bonds outstanding in the country; (3) a list of possible forfeitures; and (4) a copy of the last financial statement, as a condition precedent before he would consider the approval of the bail, although the surety company offered had tendered a certificate issued by the commissioner of banking and insurance of this state qualifying said company to give bail and authorizing it to do business in the State of New Jersey, which certificate was in full force and effect.
There are three sections of article 1 of the constitution of this state, as amended, commonly called the bill of rights, which control the court on this application. They read:
Section 8. "In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel in his defense."
Section 10. "No person shall, after acquittal, be tried for the same offense. All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident or presumption great."
Section 15. "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishments shall not be inflicted."
To further secure the liberty of the citizen, as guaranteed by these constitutional provisions, the legislature by the HabeasCorpus act has provided that all persons who are in confinement upon a charge of criminal offense, which is of a bailable nature, shall be entitled to a writ of habeas corpus *Page 81 
for the purpose of putting in such bail, and that, if it appear to the judicial officer who issues the writ upon its return that the prisoner is entitled to bail, he shall discharge the prisoner "taking his recognizance with one or more surety or sureties, in any sum at the discretion of said court or justice, having regard to the quality of the prisoner and the nature of the offense, for his appearance in the supreme court the term following, or at the next session of the court of oyer and terminer and general jail delivery of and for such county or place, where the commitment was, or where the offense was committed, or in such other court, where the said offense is properly cognizable, as the case shall require, and shall then certify the said writ with the return thereof, and the said recognizance or recognizances, unto the said court where such appearance is to be made." 2 Comp. Stat.p. 2645.
The remedy of a prisoner who is entitled to bail in cases in which the bail asked is excessive, or who is denied bail, is byhabeas corpus, and that is his only remedy, and his right to invoke it is absolute and the duty cast upon the court not only to grant the writ but to admit to bail is mandatory. That duty rests peculiarly upon the chancellor who, under the English common law, was the guardian of the personal liberty of every subject, which principle of the common law became a part of our common law by the constitution, and the legislature is without authority to relieve the chancellor of that duty.
When a court is called upon to perform its duty to release on bail it has no right to consider any matters except the nature of the crime as defined by the legislature, "the," to use the statutory language, "quality of the prisoner," and such surrounding circumstances as may be necessary, all to the end of determining the reasonable amount of the bail which should be required to secure the presence of the defendant at his trial, which is the only object of bail, and the quality of the sureties offered to determine their sufficiency.
It may be that the crime with which petitioners are now *Page 82 
charged is, in its effect, worse than a "common murder," but the court has no right either in determining whether the prisoner should be admitted to bail or the amount of the bail, to let any such knowledge control its action, for the court is confined to a consideration of the nature of the crime as defined by the legislature, namely a misdemeanor. The crime with which petitioners are charged is not put by the legislature in the category either of murder or of treason. The legislature could not make it treason for that crime is defined by the constitution. When the legislature shall have made the crime of which petitioners are charged a capital crime (if it is within the power of the legislature so to do), then, but not until then, may the court, before which petitioners stand charged, in view of their rights as guaranteed by the constitution, consider the crime as one to be treated as if it were equivalent to or worse than murder.
The papers which have been presented to the court and the proofs before it indicate that, in effect, bail has been refused. True, bail has been fixed, but the duty has been cast upon the prosecutor to pass upon the sufficiency of the sureties and the prosecutor has, by objections to bail offered, said to be captious, succeeded in retaining petitioners in imprisonment, and that the prosecutor pursued the course he did for the purpose of obtaining by illegal detention, a confession of one or more of the defendants, is obvious. However advantageous to the state such a course may be, it is opposed to the principles of our government and is a violation of the constitutional rights of a defendant.
As late as 1930, the court of errors and appeals in the matter of Frank Hague, 9 N.J. Mis. R. 89 (at p. 95);150 Atl. Rep. 322, said, quoting from Boyd v. United States, 116 U.S. 631:
"Any compulsory discovery by exorting the party's oath to convict him of crime is contrary to the principles of a free government. It is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." *Page 83 
The right of a defendant charged with crime to be promptly released on bail was recognized by the legislature when it provided that bail might be taken on holidays or Sundays.
The court of errors and appeals has held: "The power to fix and accept bail as provided in sections 20 and 24 of the Criminal Procedure act, 1898, is vested in the judge of the court of oyer and terminer, or the court of quarter sessions, who may delegate the power to the sheriff or county clerk, by written order. There is no suggestion in the statute which permits a prosecutor or his assistant to exercise any control over the admission to bail of persons charged with crime." Edelman v. Dunn,107 N.J. Law 353.
And the court further said: "The appellant concedes that neither the prosecutor or his assistant is vested with power to fix, examine, investigate or accept bail, and we agree."
It was contended that this court should not have granted petitioners' application for the writ of habeas corpus in the first instance because of the alleged aroused state of public opinion. The state constitution, article 1, section 2, however, is opposed to such non-action. It provides: "The privilege of the writ of habeas corpus shall not be suspended unless in case of rebellion or invasion the public safety may require it."
The court is forced to find, as a fact, that the quarter sessions was co-operating with the prosecutor in his very evident purpose to hold petitioners in confinement in order to obtain confessions by oppressive means when it delegated to the prosecutor the authority to determine the sufficiency of the sureties offered by petitioners. The purpose of the prosecutor was clearly shown by the nature of the information which he demanded from any surety company offering to go upon the bail, one of his demands being that the surety company supply a list of all "possible forfeitures." How could a surety company determine what possible forfeitures there might be among the bail bonds written by it? The quarter sessions had knowledge of the purpose of the prosecutor, yet it delegated its authority to approve bail to the prosecutor, the representative of the state which, in this instance, *Page 84 
was the party adverse to petitioners in the controversy before the court. Between the desire and the effectuation of any such purpose stands the constitutional provision designed to prevent the consummation of such a desire. The function of the court was to hold the scales of justice even between the state, represented by the prosecutor, and petitioners. When the court conferred upon the prosecutor the privilege of approving bail the scales were tipped quite heavily in favor of the state.
This court cannot, under the law, and will not co-operate with the prosecutor in the effectuation of any such purpose. To deny petitioners their constitutional rights would be to become a party to a violation of law, the ultimate effect of which would be worse than the commission of the highest crime by an individual or group of individuals. The court must, if our system of government is to persist, hold the scales of justice balanced between a prisoner and the state and between a prisoner and public opinion, however strong, however militant.
No possible supposed public purpose can justify a denial of the constitutional rights of an individual.
This court said in a time of war in Driver v. Smith, 89 N.J. Eq. 339
(at p. 345):
"So long as the courts are open the rights of parties must be determined by the existing law. It would be an intolerable situation if each court before whom the rights of individuals were litigated were permitted to determine whether relief should be granted or withheld upon its opinion as to whether the granting or withholding relief would aid or injure the government in its war activities, and it would be still more intolerable were the courts permitted to base their opinion upon written statements of officers of the army, no matter how high their rank."
Substitute the words "activities in the enforcement of the law" for the words "war activities" and we have precisely the same situation as was present in that case except that we are not in a state of war.
The supreme court of the United States in a very recent *Page 85 
opinion in reversing the conviction of Negro defendants, in Alabama, charged with rape on two white women, indeed a heinous crime, upon the ground that defendants had not had the proper service of counsel because of the state of public opinion strongly indicated that it is the duty of the court, no matter how strong public opinion may be, to see to it that the constitutional rights of a defendant are not infringed. Powell
v. Alabama, 287 U.S. 45.
Many citizens have been obliged in the past and will be obliged in the future to appeal to this court to protect their constitutional rights when the state of public opinion has been and will be high against them. In the past this court has not been swerved from its duty by any thought of public approval or disapproval or by any thought that a violation of the constitutional rights of those before it will subserve the public interest. In the present it will not be. In the future the court will not be, for, if it should be, anarchy in its true sense will be substituted for a government by law.
The court finds as a fact that bail in this case was denied contrary to the constitutional rights of petitioners. The result is that this court will admit petitioners to bail and take the bail. The prosecutor of the pleas will be heard upon the matter of the sufficiency of the sureties and any evidence which he may submit and any statement which he may make will receive careful consideration, but he will not be permitted to pass upon the sufficiency of or approve the surety.